S11G0587. PRESBYTERY OF GREATER ATLANTA, INC. v. TIMBERRIDGE PRESBYTERIAN CHURCH, INC.

(719 SE2d 446)

NAHMIAS, Justice.

We granted certiorari in this case to consider whether the Court of Appeals correctly applied the "neutral principles of law" doctrine set forth in *Jones v. Wolf*, 443 U. S. 595, 602-606 (99 SC 3020, 61 LE2d 775) (1979), to this hierarchical church property dispute. See *Timberridge Presbyterian Church, Inc. v. Presbytery of Greater Atlanta, Inc.*, 307 Ga. App. 191 (705 SE2d 262) (2010). Timberridge Presbyterian Church ("Timberridge") is located on property owned by appellee Timberridge Presbyterian Church, Inc. ("TPC Inc."), a corporation formed to hold and control the property of Timberridge. The Court of Appeals held that TPC Inc. did not hold the property in trust for the benefit of the Presbyterian Church (U.S.A.) ("PCUSA"), which is represented in this case by appellant Presbytery of Greater Atlanta, Inc. ("Presbytery"), the PCUSA's governing body for the geographic district in which Timberridge is located. For the reasons that follow, we reverse.

1. Timberridge was formed in Henry County in 1830. In 1880, Timberridge became a member of the Presbyterian Church in the United States ("PCUS"), which was the southern branch of the post-Civil War denomination. The PCUS Book of Church Order ("BOCO") set forth the rules governing the southern church. By early 1982, and apparently well before then, the northern and southern branches of the Presbyterian Church were meeting to discuss reunification, and the PCUS was meeting to consider whether to add a provision to its Book of Church Order stating that local churches hold their property in trust for the PCUS.

At a January 26, 1982, meeting of the Presbytery of Atlanta, the immediate predecessor of the Presbytery of Greater Atlanta, to consider and vote on constitutional amendments to the Book of Church Order, including the property trust provision, the participants included Timberridge's pastor and one of its elders. The record does not reveal how they voted, but it shows that the property trust provision was approved by a vote of 155 for and 96 against. In June 1982, the General Assembly of the PCUS adopted the property trust provision. The provision stated that "[a]ll property held by or for a particular [local] church, whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, . . . is

held in trust . . . for the use and benefit of the [PCUS]." BOCO § 6.3. About two weeks later, the Presbytery of Atlanta met to vote on the reunification of the southern and northern branches of the Presbyterian Church. Timberridge's pastor and an elder again attended. The vote was 235 for reunification and 54 against; an affidavit by Timberridge's pastor states that he voted in favor of reunification.

In 1983, the PCUS and the northern branch of the denomination formally reunited as the Presbyterian Church (U.S.A.), and Timberridge became a member of the PCUSA. The PCUSA Book of Order ("BOO"), which took effect immediately upon the formation of the reunited church, sets forth the rules governing the national church and its local member ("particular") churches. The Book of Order provides that "[t]he government of the church is representative," BOO § G-6.0107, and that the PCUSA "shall be governed by representative bodies," which in order from lowest to highest are called "session, presbytery, synod, General Assembly," § G-9.0101. Each of those bodies is composed of presbyters (the elders and ministers of the particular churches), see id. and § G-4.0301 (b); is governed by majority vote, see § G-4.0301 (e); and "shall participate through its representatives in the planning and administration of the next higher body," § G-9.0404 (a). A higher governing body has "the right of review and control" over decisions of lower ones. § G-4.0301 (f). As these provisions demonstrate, the PCUSA operates as a representative democracy, as has historically been the case with Presbyterian churches. See § G-1.0400 & n. 6.

Chapter 8 of the Book of Order contains the provisions of the church constitution governing property. Mirroring Section 6.3 of the PCUS Book of Church Order adopted the year before reunification, Section G-8.0201 of the BOO is an explicit trust provision, specifying that "[a]ll property held by or for a particular church . . . , whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, . . . is held in trust nevertheless for the use and benefit of the [PCUSA]." Section G-8.0301 provides that if a local church stops using its property as a church of the PCUSA, the property "shall be held, used, applied, transferred, or sold as provided by the presbytery." Section G-8.0601 similarly provides that, in the event of a schism within the membership of a local church,

> the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the Presbyterian Church (U.S.A.). This determination does not depend upon which faction received the majority vote within the particular church at the time of the schism.

Section G-8.0701 of the Book of Order permitted a local church, within eight years of the formation of the PCUSA, to opt out of a property provision of the BOO, but only if the local church was not "subject to a similar provision of the Constitution of the church of which it was a part" before the formation of the PCUSA. In addition, the PCUSA's Articles of Agreement, which set forth the contractual agreement for reunification between the northern and southern branches, provided that a local church of either branch could petition for dismissal from the PCUSA for eight years after the reunion and if two-thirds of the congregation voted for dismissal, the local church would be dismissed and would retain all of its property. See Articles 13.3 (e), (g), 13.4.

The 1983 Book of Order also provided that, "[w]henever permitted by civil law, each particular church shall cause a corporation to be formed" to "receive, hold, encumber, manage, and transfer property, real or personal, for the church." §§ G-7.0401, G-7.0402. As required by these provisions, in 1984 Timberridge Presbyterian Church, Inc. was formed as a Georgia non-profit corporation to hold and control the property of Timberridge Presbyterian Church. TPC Inc.'s Articles of Incorporation state that the corporation's purpose is "to be a church institution which is a member of the Presbytery of Atlanta of the [PCUSA] or any successor Presbytery thereof" and that its bylaws cannot conflict with the PCUSA Book of Order "as the same now exists or may hereafter from time to time be amended." The Articles also provide that the corporation has the power to "receive, hold, encumber, manage, and transfer property, real and personal," for the church, and that the corporation's members will consist of "active members" of Timberridge as defined by the PCUSA Book of Order. Section G-5.0202 of the BOO provides that "an active member of a particular church is a person . . . [who] has voluntarily submitted to the government of [the PCUSA]."

Until 1970, the land on which Timberridge is located was owned by individuals who were also members of the church. From 1970 through 1987, the individual owners conveyed their various interests in the land to Timberridge and "its successors," to Timberridge and its "heirs and assigns," or simply to Timberridge without any successors or assigns language. During the eight years after reunification, Timberridge did not seek to retain all of its property by petitioning for dismissal from the PCUSA as allowed by the Articles of Agreement. However, in November 1987, following a vote of its congregation, Timberridge sent the Presbytery a letter stating that Timberridge had "voted to take the 'property exemption' as provided in the Book of Order, Section G-8.0700." Timberridge did not receive a response to this letter from the Presbytery or the PCUSA. In 1999, Timberridge transferred all of its real property by warranty deeds to

TPC Inc. and "its successors, heirs, executors, administrators, and assigns in fee simple."

For almost a quarter-century after Timberridge affiliated with the PCUSA in 1983, the local church functioned as a regular member of the national church. Its pastor from 1978 to 1984 stated that Timberridge "took part in the governance of the denomination by regularly attending meetings of the Atlanta Presbytery" and "experienced benefits of being associated with the [PCUSA] such as participation in the representational governance . . . and the availability of the denomination's resources." Similarly, Timberridge's pastor from 1984 to 2003 stated that the church "actively participated in the governance of the denomination" and "experienced some of the benefits of being associated with the greater denomination, such as locating an Associate Pastor with the help of the [Presbytery] . . . [and] taking advantage of . . . [a] year round camp and conference center."

By 2007, however, a dispute arose between TPC Inc. and the Presbytery and PCUSA as to who controls Timberridge's property. In September 2007, TPC Inc. filed an action for declaratory judgment and injunctive relief against the Presbytery, seeking a declaration that TPC Inc. owned all Timberridge property and did not hold it in trust for the benefit of the PCUSA. TPC Inc. later amended its complaint to add a quiet title action. The Presbytery filed a counterclaim, contending that TPC Inc. held the church property in trust for the benefit of the PCUSA and should be enjoined from transferring the property. In November 2007, a majority of the Timberridge congregation voted to disaffiliate from the PCUSA. In January 2008, the Presbytery filed an ejectment action against the majority faction identifying itself as Timberridge. Five months later, the majority faction of Timberridge affiliated with the Evangelical Presbyterian Church, a separate denomination.

The parties filed cross-motions for summary judgment, and on March 9, 2009, the trial court entered two separate but almost identical orders in the 2007 and 2008 lawsuits. Applying the neutral principles of law doctrine, the court concluded, among other things, that Section G-8.0201 of the Book of Order created a trust in favor of the PCUSA as to any property held by TPC Inc. The court also concluded that the opt out provision of Section G-8.0701 was of no avail to TPC Inc. with respect to the trust issue, because Timberridge was already "subject to a similar provision of the Constitution of the [general] church of which it was a part" before the formation of the PCUSA — the explicit property trust provision of the PCUS Book of Church Order. The court therefore granted summary judgment to the Presbytery in both actions. TPC Inc. filed appeals of both orders in this Court, which we transferred to the Court of Appeals

after finding that the appeals did not come within our equity or title to land jurisdiction. See Case Nos. S09A1494, S09A1495 (Apr. 12, 2010); Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (1), (2).

The Court of Appeals reversed the trial court's judgments. It weighed the neutral principles — the relevant deeds, state statutes, and local and national church documents — together, saying that the national church documents could not be dispositive. See *Timberridge*, 307 Ga. App. at 193. Instead, the court focused on whether the evidence established an express trust under OCGA § 53-12-20. See *Timberridge*, 307 Ga. App. at 200-201. The court concluded that,

> [r]ead as a whole in light of the relevant law, the evidence is inadequate to show the existence of a trust in favor of the Presbytery. The evidence must reveal that "factors other than mere connectional relationship between a local and general church were present." In the absence of some showing of intention and assent on the part of Timberridge, neutral principles of law cannot support the unilateral imposition of a trust provision drafted by the purported beneficiary of the trust and the resulting deprivation of the opposing party's property rights.

Id. at 200 (citation omitted). This Court then granted certiorari.

2. To avoid First Amendment concerns in resolving property disputes in hierarchical religious denominations, secular courts apply "neutral principles of law" to determine whether the local church or the parent church has the right to control local property, avoiding any inquiry into religious doctrine. See *Jones*, 443 U. S. at 602-606.[1] These "neutral principles" include relevant deeds, state statutes, and the governing documents of the local and general churches. See *Jones*, 443 U. S. at 602-606 (discussing the "corporate charter" of the local church and the "constitution of the general church"); *Georgia Dist. Council of the Assemblies of God, Inc. v. Atlanta Faith Mem. Church, Inc.*, 267 Ga. 59, 60-61 (472 SE2d 66) (1996) (reviewing the bylaws of the denomination); *Crumbley v. Solomon*, 243 Ga. 343, 343-344 (254 SE2d 330) (1979) (reviewing the Disciplinary Rules of the parent church); *Carnes v. Smith*, 236 Ga. 30, 37 (222 SE2d 322) (1976) (reviewing the Book of Discipline of the parent church and noting that the corporate charter of the local church would have been relevant if the local church had one). We review all of these materials, keeping in mind that the outcome of these church property disputes usually turns on the specific facts

---

[1] The parties do not dispute that the Presbyterian Church (U.S.A.) is a hierarchical denomination. See *Timberridge*, 307 Ga. App. at 192.

presented in the record, that the neutral principle factors are interrelated, and that our ultimate goal is to determine "the intentions of the parties" at the local and national level regarding beneficial ownership of the property at issue as expressed "before the dispute erupt[ed]" in a "legally cognizable form." *Jones v. Wolf*, 443 U. S. at 603, 606.

### (a) Deeds

The deeds that transferred the property at issue from the individual owners to Timberridge between 1970 and 1987 do not contain trust language. The 1999 deeds then transferred the property from Timberridge to TPC Inc. and "its successors, heirs, executors, administrators, and assigns in fee simple." The Court of Appeals held that the "absence of any trust language in the deeds" weighed against the recognition of a trust in favor of the PCUSA. *Timberridge*, 307 Ga. App. at 196. We disagree.

It is true that neither the 1970-1987 deeds nor the 1999 deeds show an intent by the grantors to create a trust. But they also do not expressly preclude the creation of one. And it is undisputed that Timberridge affiliated with the PCUSA in 1983 and thus brought itself under the national church's constitution, which squarely states that local churches such as Timberridge hold their property in trust for the PCUSA even if "legal title is lodged in a corporation." Given that provision, Timberridge would have no reason to believe that its deeds needed to recite a trust in favor of the general church, particularly the 1999 deeds transferring the property at issue to TPC Inc. Thus, the absence of language in the deeds creating a trust in favor of the national church is of limited value in deciding the question before us, and we turn to consideration of other neutral principles.

### (b) Statutes
### (1) OCGA § 14-5-46

OCGA § 14-5-46, which is entitled "Conveyances to churches or religious societies confirmed," provides:

> All deeds of conveyance executed before April 1, 1969, or thereafter for any lots of land within this state to any person or persons, to any church or religious society, or to trustees for the use of any church or religious society for the purpose of erecting churches or meeting houses shall be deemed to be valid and available in law for the intents, uses, and purposes contained in the deeds of conveyance. All lots of land so conveyed shall be fully and absolutely vested in such church or religious society or in their respective trustees for the uses and purposes expressed in the deed to be held by them or their trustees for their use by succession,

according to the mode of church government or rules of discipline exercised by such churches or religious societies.[2]

This Court has repeatedly applied this statute and its predecessors, including Code Ann. § 22-5507, to church property disputes. See, e.g., *Holiness Baptist Assn. v. Barber*, 274 Ga. 357, 358-359 (552 SE2d 90) (2001); *Crumbley*, 243 Ga. at 344-345; *Carnes*, 236 Ga. at 37-38. However, the Court of Appeals held that OCGA § 14-5-46 could not be applied here to support the creation of a trust because "the deeds . . . do not convey the property to trustees, nor to the Presbytery or PCUSA, but simply to 'Timberridge Presbyterian Church' or 'Timberridge Presbyterian Church, Inc.' " *Timberridge*, 307 Ga. App. at 194.

By its plain language, OCGA § 14-5-46 applies (1) if there is a deed "to any person or persons," "to any church or religious society," *or* "to trustees" for the use of any church and (2) if the deed is "for the purpose of erecting churches or meeting houses." Thus, the statute is not limited to deeds to trustees or that contain trust language, and indeed this Court applied OCGA § 14-5-46 to a deed that did not contain any trust language in *Barber*. See 274 Ga. at 358-359. There, the deed conveying the local church property was simply "to named individuals as 'Deacons of Vickers Holiness Baptist Church [the local church] and their successors in office.' " Id. at 359, n. 7. Citing OCGA § 14-5-46, we held that

> it is undisputed that the Association [the general church] remains a hierarchy, that the [local] Church has been a member of the Association for over 30 years, and that the Church is subject to the Association's discipline. Such discipline unquestionably provides that the Association "shall hold all church property," thereby implying a trust for the benefit of the Association.

*Barber*, 274 Ga. at 359 (citations and footnotes omitted).

Although the Court of Appeals' reason for not applying OCGA § 14-5-46 was erroneous, we note that this Court and the Court of Appeals have failed to analyze another component of the statutory text in our modern cases, namely, whether the property was con-

---

[2] When a conveyance that falls within OCGA § 14-5-46 is made to trustees, OCGA § 14-5-47 provides:

> All trustees to whom conveyances are or shall be executed, for the purposes expressed in Code Section 14-5-46, shall be subject to the authority of the church or religious society for which they hold the same in trust and may be expelled from said trust by such church or society, according to the form of government or rules of discipline by which they may be governed.

veyed "for the purpose of *erecting* churches or meeting houses." See, e.g., *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345; *Carnes*, 236 Ga. at 37-38; *Rector &c. of Christ Church v. Bishop of the Episcopal Diocese of Ga.*, 305 Ga. App. 87, 90-92 (699 SE2d 45) (2010), aff'd 290 Ga. 95 (718 SE2d 237) (2011). Compare *Harris v. Brown*, 124 Ga. 310, 314 (52 SE 610) (1905) (holding that OCGA § 14-5-46's predecessor applied only to deeds conveying property for the purpose of erecting a church building and therefore did not apply to the deed in question, which conveyed property for the purpose of erecting both church and school buildings).

Instead, we appear to have viewed OCGA §§ 14-5-46, 14-5-47, and their predecessors, which date back more than two centuries, see Ga. Laws 1805, pp. 15-16, as expressing this State's policy of looking to "the mode of church government or rules of discipline" in resolving church property disputes, even when the statutory text does not squarely apply. This policy is consistent with *Jones v. Wolf*'s focus on local and parent church governing documents as an important neutral principle. See 443 U. S. at 602-606. See, e.g., *Barber*, 274 Ga. at 359; *Carnes*, 236 Ga. at 38 (stating broadly that "Code Ann. § 22-5507 [now OCGA § 14-5-46] recognizes and validates deeds conveying land for church purposes according to the limitations set out in the deed and for use 'according to the mode of church government or rules of discipline' "). In any event, although OCGA § 14-5-46 may weigh in favor of the trial court's judgments under our precedents, we need not rely on it to resolve this case.

### *(2) OCGA § 53-12-20*

Instead of focusing on OCGA § 14-5-46, the Court of Appeals relied heavily, and incorrectly, on Georgia's generic express trust statute. OCGA § 53-12-20 provides, in relevant part, as follows:

> (a) [A]n express trust shall be created or declared in writing and signed by the settlor . . . .
>
> (b) An express trust shall have, ascertainable with reasonable certainty:
>
> (1) An intention by a settlor to create such trust;
>
> (2) Trust property;
>
> (3) Except for charitable trusts, . . . a beneficiary who is reasonably ascertainable at the time of the creation of such trust or reasonably ascertainable within the period of the rule against perpetuities;
>
> (4) A trustee; and

(5) Trustee duties specified in writing or provided by law.

. . .

The Court of Appeals effectively held that local and national church documents cannot suffice to establish a trust in favor of the national church without compliance with this statute. The court concluded that the church documents in this case could not create a trust in favor of the PCUSA because they were not "sufficient to establish an express trust" since they did not "show 'with reasonable certainty' an intention on the part of Timberridge to create an express trust, OCGA § 53-12-20 (b)." *Timberridge,* 307 Ga. App. at 200.

Requiring compliance with OCGA § 53-12-20, however, would be inconsistent with the teaching of *Jones v. Wolf* that the burden on a national church and its member churches to provide which one will control local church property in the event of a dispute will be "minimal." 443 U. S. at 606. In this regard, the dissenters in *Jones* expressed concern that the neutral principles doctrine would unconstitutionally interfere with the free exercise rights "of those who have formed the association and submitted themselves to its authority." *Jones,* 443 U. S. at 618 (Powell, J., dissenting). The Court rejected that concern in this important passage:

Nothing could be further from the truth. The neutral-principles approach cannot be said to "inhibit" the free exercise of religion. . . . Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. *The burden involved in taking such steps will be minimal.* And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Jones,* 443 U. S. at 606 (emphasis added).

As this passage explains, local churches can modify their deeds, amend their charters, or draft a separate legally recognized document to establish an express trust as set forth in OCGA § 53-12-20. But that is not the *only way* in which the parties can ensure that

local church property will be held in trust for the benefit of the national church; it may also be done through the national church's constitution, for example, by making it "recite an express trust." *Jones*, 443 U. S. at 606. If, as the Court of Appeals held in this case, hierarchical denominations must fully comply with OCGA § 53-12-20 for the parent church to retain control of local church property when there is a schism and a majority of the local church congregation disaffiliates, then an enormous number of deeds and corporate charters would need to be examined and re-conveyed or amended; the burden on the parent churches, the local churches that formed the hierarchical denominations and submitted to their authority, and the free exercise of religion by their members would not be minimal but immense.

Moreover, the Court of Appeals' approach is inconsistent with this Court's cases deciding that local churches held their property in trust for the general church with no mention of OCGA § 53-12-20 or evidence of compliance with its terms. See, e.g., *Kemp v. Neal*, 288 Ga. 324, 326-329 (704 SE2d 175) (2010) (plurality); id. at 331-334 (Carley, P. J., dissenting in part); *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345; *Carnes*, 236 Ga. at 37-38. If compliance with OCGA § 53-12-20 were necessary to create a trust in favor of a national church, those cases could not have been decided as they were. We also note that our numerous church property cases either made no mention of the generic implied trust statutes, now OCGA §§ 53-12-90 to 53-12-93, see, e.g., *Kemp*, 288 Ga. at 326-329 (plurality); id. at 331-334 (Carley, P. J., dissenting in part); *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345, or explained that the requirements of those statutes were *not* met, see *Carnes*, 236 Ga. at 37-38 — and yet the Court still concluded that the local church property was held in trust for the general church.

The Court of Appeals dismissed our precedent by saying that our cases did not "cite the express trust provisions . . . because these cases involved *implied* trusts." 307 Ga. App. at 194-195 (emphasis added). But this case, like previous cases, involves a trust implied under neutral principles of law, even though one aspect of that analysis is consideration of trust language expressly included in the national church's discipline. See, e.g., *Barber*, 274 Ga. at 359 ("implying a trust" for the benefit of the general church where its discipline expressly provided that the general church "shall hold all church property").

In short, and contrary to the Court of Appeals' decision, the fact that a trust was not created under our state's generic express (or implied) trust statutes does not preclude the implication of a trust on church property under the neutral principles of law doctrine. See *Kemp*, 288 Ga. at 326-329 (plurality); *Barber*, 274 Ga. at 358-359;

*Crumbley,* 243 Ga. at 344-345; *Carnes,* 236 Ga. at 37-38. Accord *Bishop and Diocese of Colorado v. Mote,* 716 P2d 85, 100 (Colo. 1986) (explaining that *Jones v. Wolf* "did *not* restrict the inquiry to a search for explicit language of express trust" (emphasis in original)).

### (c) Church Governing Documents

### (1) Local Church Documents

It is clear that Timberridge formed TPC Inc. in 1984 because Section G-7.0401 of the governing Book of Order adopted with the PCUSA's formation in 1983 required all member churches to form a corporation to hold and control church property if permitted by their state law. TPC Inc.'s Articles of Incorporation filed with the Georgia Secretary of State unequivocally submit Timberridge and its property to the PCUSA as its governing authority. The Articles provide that the corporation is "to be a church institution which is a member of the Presbytery of Atlanta of the [PCUSA], or any successor Presbytery thereof." Indeed, the corporation's members must be "active members" of Timberridge "as defined in the Book of Order of the [PCUSA]," which defines an "active member of a particular church" to be a person who has "voluntarily submitted to the government of this [general] church." BOO § G-5.0202. Thus, the corporation's charter precludes any TPC Inc. member who refuses to submit to the government of the PCUSA from continuing to function as a member of TPC Inc.[3]

In addition, TPC Inc.'s Articles of Incorporation state that its bylaws cannot conflict with the PCUSA Book of Order. A corporation's " '[b]ylaws' means the code of rules other than the articles [of incorporation] adopted pursuant to this chapter for the regulation or management of the affairs of the corporation . . . ." OCGA § 14-3-140

---

[3] The dissents would reject any consideration of the "active member" requirement of the Articles of Incorporation. See Presiding Justice Carley's Dis. Op. at 291-292; Judge Benefield's Dis. Op. at 296-297. However, that requirement reveals the intent of the local church, which formed the TPC Inc. corporation in 1984 and then transferred legal title to its property to the corporation in 1999, that each of the corporation's members abide by the government of the national church, which has since its foundation in 1983 included an explicit trust on local church property. Unlike the dissents, we do not quote or rely on aspects of the Book of Order's definition of an "active member" that implicate religious doctrine, only the element that requires submission to the government of the PCUSA, because consideration of religious doctrine is forbidden under the First Amendment and the neutral principles doctrine. We similarly do not consider any part of the Articles of Incorporation, Book of Order, or Book of Church Order that relates to spiritual rather than organizational and property matters. National and local church documents will often include a mixture of religious precepts and provisions dealing with government, property, and other matters common to both religious and non-religious organizations. Courts may not inquire into the former, but *Jones v. Wolf* and this Court's subsequent cases allow and indeed direct us to consider the latter. See also *Bishop and Diocese of Colorado v. Mote,* 716 P2d at 101 ("*Jones v. Wolf* does not require the civil courts to shy away from those documents, or provisions in documents, that intertwine religious concepts with matters otherwise relevant to the issue of who controls the property.").

(4). See also OCGA § 14-5-40 (providing that Chapter 3 of Title 14 is applicable to nonprofit corporations formed for religious purposes). As discussed in Division 1 above, the Book of Order provides comprehensive rules regarding the government of a local church, its relationship to the Presbytery and the PCUSA, and its property — including an explicit provision stating that "[a]ll property held by or for a particular church . . . , whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, . . . is held in trust nevertheless for the use and benefit of the [PCUSA]."

The Court of Appeals erroneously concluded that TPC Inc.'s charter sheds no light on the trust issue, saying the Articles of Incorporation "do not express such clear intent to render the local church corporation subject in all matters both ecclesiastical and temporal to the authority of the Presbytery or PCUSA." *Timberridge*, 307 Ga. App. at 196-197. It may be that TPC Inc. did not render itself subject to the authority of the PCUSA and Presbytery in *all* temporal matters (and courts should pay no attention to ecclesiastical matters). But TPC Inc. holds legal title to the local church's property and its founding document plainly makes the local church subject to the PCUSA Book of Order, which contains a very explicit trust provision. And under the corporate charter and the Book of Order, any effort by TPC Inc. or its putative members to break away from the PCUSA results in the individuals no longer being members of the corporation and the property reverting to the control of the Presbytery. See BOO §§ G-8.0301, G-8.0601. By adopting these Articles of Incorporation, TPC Inc., with unmistakable clarity, agreed to bind itself to the Presbytery and the PCUSA and to abide by the Book of Order, which has included the explicit property trust and other governance provisions since the PCUSA was established in 1983 — well before Timberridge transferred the property at issue in this case to TPC Inc. in 1999.

Presiding Justice Carley's dissent notes that Article X allows amendment of the Articles of Incorporation and does not expressly prohibit an amendment from conflicting with the Book of Order. See Dis. Op. at 292. The dissent says that this "necessarily" means that TPC Inc. "is not subject to the Book of Order or its trust provision." Id. But it means no such thing. As a matter of law, articles of incorporation bind a corporation and its members until the document is properly amended. What is relevant about the Articles of Incorporation is that in its own charter TPC Inc. proclaimed its allegiance to the PCUSA Book of Order, which included a provision explicitly stating that local church property is held in trust for the use and benefit of the PCUSA, and at no time during the more than two decades before this dispute erupted and the eight years after it was deeded the property at issue did TPC Inc. even *seek* to amend its

Articles to demonstrate any different intent.

### (2) National Church Documents

Timberridge joined the PCUSA when the reunited national church was established in 1983. There is no dispute that *at that time* (1) the PCUSA's governing constitution plainly stated that local churches hold their property in trust for the use and benefit of the general church, see BOO § G-8.0201, and (2) the governing constitution of the general church that Timberridge had previously belonged to, the PCUS, contained an identical trust provision, see BOCO § 6.3. Moreover, *when Timberridge affiliated with the PCUSA*, it agreed that it "was a local expression of the universal church," BOO § G-4.0102, that it would be "governed by this Constitution," § G-4.0104, that its active members have "voluntarily submitted to the government of this church," § G-5.0202, and that it would "function under the provisions of this Constitution." § G-7.0101. Timberridge then had the right to leave the PCUSA for eight years, taking its property with it, see Article 13 of PCUSA Articles of Agreement, but instead it stayed. And while Timberridge purported to opt out of the property provisions of the Book of Order pursuant to its November 1987 letter to the Presbytery, it plainly could not opt out of the property *trust* provision in Section G-8-0201, which mirrored the one in Section 6.3 of the PCUS Book of Church Order. See BOO § G-8.0701 (stating that a local church could opt out of a property provision of the BOO within eight years of the formation of the PCUSA only if the local church was not "subject to a similar provision of the Constitution of the church of which it was a part" before the PCUSA was formed).[4]

Thus, contrary to the Court of Appeals' view that the PCUSA "unilateral[ly] impos[ed]" the trust provision without any assent by the local church, see 307 Ga. App. at 200, Timberridge's act of affiliating with the PCUSA in 1983 with the trust provision *already* in its governing constitution demonstrated that Timberridge assented to that relinquishment of its property rights — rights it then

---

[4] We note that this did not leave Timberridge's 1987 letter without import. Section G-8.0501 of the Book of Order precludes a local church from buying, selling, mortgaging, or otherwise encumbering real property, or from acquiring real property subject to an encumberance or condition, without the written permission of the Presbytery. Because the PCUS Book of Church Order did not contain a similar provision, Timberridge could opt out of that provision, allowing the local church to buy, sell, and encumber real property without prior approval (but still in trust for the national church). We also note that, even if Timberridge's "opt out" under § G-8.0701 were somehow deemed effective, it would not help TPC Inc.'s case. Section G-8.0701 goes on to say that "[t]he particular church voting to be so exempt shall hold title to its property and exercise its privileges of incorporation and property ownership under the provisions of the Constitution to which it was subject immediately prior to the establishment of the [PCUSA]." Thus, Timberridge's property would remain subject to the identical trust provision of the BOCO – "the Constitution to which it was subject immediately prior to the establishment" of the PCUSA.

chose not to reassert by leaving the new national church during the next eight years. The creation of TPC Inc. in 1984 and the transfer of Timberridge's property to that corporate entity in 1999 further demonstrated Timberridge's acceptance of the trust provision, as discussed in the last subdivision. And Timberridge's continued membership in the PCUSA, for nearly a quarter of a century in all, with the trust provision always in full effect, further bolsters this conclusion. See *Barber*, 274 Ga. at 359; *Crumbley*, 243 Ga. at 345.

For these reasons, in considering the national church's constitution in this case, we need not address the more difficult question of whether a general church may *amend* its governing documents, pursuant to procedures agreed upon by it and its member churches, to *add* an explicit property trust provision and make that trust apply to the property of its existing members, particularly where the evidence does not indicate that the national church historically had authority over local church property. See *Kemp*, 288 Ga. at 331-332 (Carley, P. J., dissenting in part).[5] However that question is resolved, it may be incorrect to characterize such an amendment as the "unilateral imposition of a trust provision," as the Court of Appeals did here, see 307 Ga. App. at 200, if the national church enacted the trust provision pursuant to rules of representative government that the local and national churches previously agreed to follow, see BOO §§ G-4.0104, G-7.0101, and in which the local church's representatives could and did participate. We also need not address TPC Inc.'s contention that the procedures used by the PCUS and the PCUSA to adopt the property trust provisions of the Book of Church Order and the Book of Order were flawed. See *Rector &c. of Christ Church*, 305 Ga. App. at 97 (holding that the First Amendment precludes a court from "questioning the validity of the process by which the church legislates"); *Episcopal Church Cases*, 198 P3d 66, 80 (Cal. 2009) (same), cert. denied, ___ U. S. ___ (130 SC 179, 175 LE2d 41) (2009).

Our conclusion regarding the effect of the local and national church documents in this case is consistent with the precedent of the United States Supreme Court, this Court, and many state courts. The decisions from other states on which Presiding Justice Carley's

---

[5] Compare *State Presbytery of the Cumberland Presbyterian Church v. Hudson*, 40 SW3d 301, 308-310 (Ark. 2001) (4-3 decision holding that the explicit trust provision of the general Cumberland Presbyterian Church could not be applied to a local church that became a member of the general church and acquired its property before the adoption of the provision), with *Presbytery of Hudson River of Presbyterian Church (U.S.A.) v. Trustees of First Presbyterian Church & Congregation of Ridgeberry*, 72 AD3d 78, 95-97 (N.Y. App. Div. 2010) (applying the explicit trust provision of the PCUSA BOO to a local church that both became a member of the national church and acquired its property before the adoption of the provision, also noting that the BOO's trust provision may simply have codified a longstanding implied trust).

dissent principally relies are readily distinguishable[6] or wrongly decided,[7] and Judge Benefield's dissent cites no precedent that supports her position.[8]

---

[6] See *From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church*, 803 A2d 548, 553-554, 568-569 (Md. 2002) (holding that local church property was not held in trust for the AME Zion denomination where the local church amended its articles of incorporation to delete all references to AME Zion and to expand its corporate powers over church property well before the dispute arose); *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 489 A2d 1317, 1323-1325 (Pa. 1985) (holding that local church property was not held in trust for the national church, which did not have trust language in its Book of Order when the local church affiliated with it or when the local church amended its charter in 1981 to disaffiliate); *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States*, 464 NE2d 454, 461-463 (N.Y. 1984) (holding that local church property was not held in trust for the national church, where the local church charter was not amended to invoke a New York statute creating a trust relationship with the national church and the national church did not have trust language in its Book of Order before the dispute arose and indeed had rejected a proposed trust provision in the past).

[7] Presiding Justice Carley relies heavily on *Carrollton Presbyterian Church v. Presbytery of South Louisiana of the Presbyterian Church (USA)*, 77 S3d 975 (La. App. 2011), but we find the reasoning of the Louisiana intermediate appellate court unpersuasive. *Carrollton* misinterprets the general church constitutions in holding that the express trust provision of the PCUSA Book of Order is ineffectual because it is "inconsistent" with the provision of the PCUS Book of Church Order that Timberridge opted back into, see footnote 4 above, which allows Timberridge to sell or encumber local church property without prior approval from the general church. See *Carrollton*, 77 S3d at 981. However, *Carrollton* cited no legal authority for its reasoning, which is simply wrong. In addition to contradicting the rule against construing legal documents to render a provision (the express trust clause) surplusage, it contradicts the reality that a trustee normally has broad authority to dispose of the trust corpus without prior approval of the beneficiary – although the trustee must act as a fiduciary in doing so. See, e.g., OCGA § 53-12-261 (listing the extensive powers of a trustee of an express trust, as a fiduciary, to deal with trust property, including selling, transferring, investing, leasing, and mortgaging it, without prior approval of the beneficiary). Where a legal titleholder does need to obtain the consent of a third party to encumber or dispose of property, that may indicate that a trust exists in favor of the third party, but the converse is not true and indeed is not typical of trusts. Timberridge does not have "absolute or uncontrolled discretion to dispose of the property," nor is Timberridge both the "single trustee" and "sole beneficiary" of the property. Presiding Justice Carley's Dis. Op. at 289. To the contrary, the Book of Order to which Timberridge submitted explicitly states that the local church holds property "in trust nevertheless for the use and benefit of the [PCUSA]." Finally, the *Carrollton* court's reliance on Louisiana trust statutes, see 77 S3d at 982, is inconsistent with this Court's precedents applying Georgia statutes in church property cases. See Division 2 (b) above.

[8] Judge Benefield questions whether this case should be decided on summary judgment, see Dis. Op. at 294, 297-300, but she stands alone in that view. The parties have agreed that the material facts are undisputed, and both parties moved for summary judgment. See *Timberridge*, 307 Ga. App. at 191 ("The relevant facts are not generally disputed by the parties."). The trial court granted the Presbytery's motion and denied TPC Inc.'s motion, and the Court of Appeals reversed that judgment, but neither court suggested that summary judgment one way or the other was inappropriate. Moreover, as Judge Benefield acknowledges, neither party has ever enumerated error in this regard, although both parties have been on the losing side at times during the extensive appellate review of this case. The material facts – the facts regarding the documents examined under the neutral principles of law doctrine – are undisputed; whether a trust on the local church property in favor of the general church is determined to exist when that doctrine is applied is a legal determination based on those facts.

Finally, we reject Judge Benefield's assertion that the neutral principles doctrine, and particularly its consideration of church governing documents, "creates a bias for the national church." Dis. Op. at 299. Before *Jones v. Wolf*, courts normally resolved property disputes in hierarchical denominations simply by deferring to the decision of the general church's ecclesiastical authorities. See *Watson v. Jones*, 80 U. S. 679, 726-729 (20 LE 666) (1871). *That* approach was "biased" toward the national church — and it should be noted that the four Justices who dissented in *Jones v. Wolf* did not suggest that the neutral principles doctrine was insufficiently fair to local churches but instead wanted to continue simply to defer to the general church to avoid First Amendment concerns. See 443 U. S. at 620-621 (Powell, J., dissenting).

The neutral principles doctrine, as approved by the majority in *Jones v. Wolf* and as applied by this Court, allows hierarchical denominations to structure the property relationships between the general and local churches before disputes arise. The result is not pre-ordained; it depends on the deeds, statutes, and national and church governing documents. What has happened over the years since *Jones v. Wolf* is that many hierarchical denominations have added more explicit property provisions to their general and local church governing documents, as the Supreme Court said would be appropriate. See 443 U. S. at 606. Thus, instead of our finding no mention of property issues in those documents, see *Jones II*, 244 Ga. at 389-390 (finding no trust for the general church where review of the "corporate charters, relevant deeds, and the organizational constitutions of the denomination" found only "silence"), we find provisions showing either that the general church does not control local church property, see *Georgia Dist. Council of Assemblies of God*, 267 Ga. at 61 & n. 2, or, as in this case and others, provisions showing that local church property is held in trust for the general church. Applying the neutral principles with an even hand, we simply enforce the intent of the parties as reflected in their own governing documents; to do anything else would raise serious First Amendment concerns.

### 3. Conclusion

In sum, the resolution of this church property dispute in the national church's favor does not rest on the "mere connectional relationship between a local and general church." *Carnes*, 236 Ga. at

---

Indeed, this will often be the situation, as it typically has been in this Court's (and most other courts') church property cases since *Jones v. Wolf* – which, we note, was itself a summary judgment case from Georgia. See *Jones v. Wolf*, 244 Ga. 388 (260 SE2d 84) (1979) ("*Jones II*") (affirming, on remand from the U. S. Supreme Court, the trial court's judgment for the local church based on the neutral principles doctrine).

35. Instead, our decision derives from the specific language of the governing documents adopted by the local and national churches, supported by the policy reflected in OCGA § 14-5-46 and not contradicted by the deeds at issue. It is based, therefore, on the sort of legal materials "familiar to lawyers and judges," embodied in "legally cognizable form," and having nothing to do with the church's religious doctrine. *Jones v. Wolf*, 443 U. S. at 603, 606. Like the trial court, we conclude that neutral principles of law demonstrate that an implied trust in favor of the PCUSA exists on the local church's property to which TPC Inc. holds legal title. See *Barber*, 274 Ga. at 359; *Crumbley*, 243 Ga. at 345. The Court of Appeals erred in concluding to the contrary.

*Judgment reversed. Benham, Thompson, and Melton, JJ., concur. Hunstein, C. J., Carley, P. J., and Chief Judge Deborah C. Benefield dissent. Hines, J., not participating.*

CARLEY, Presiding Justice, dissenting.

The majority is mistaken in disregarding, as wrongly decided, *Carrollton Presbyterian Church v. Presbytery of South Louisiana of the Presbyterian Church (USA)*, 77 S3d 975 (La. App. 2011), which is apparently the only precedent in the entire nation which is directly on point. Moreover, the majority has contrived an opinion which purports to make a thorough examination of the documents relevant to the "neutral principles of law" doctrine and to find the existence of a trust pursuant thereto even though it virtually ignores a necessary element of trusts.

As the majority acknowledges, Timberridge gave the Presbytery timely notice of the congregation's "vote[ ] to take the 'property exemption' as provided in the Book of Order (G-8.0700)." The majority opines that Timberridge "plainly could not opt out of the property trust provision in Section G-8.0201, which mirrored the one in Section 6.3 of the PCUS Book of Church Order. [Cit.]" (Emphasis omitted.) Majority Opinion, p. 284. As the majority recognizes, § G-8.0701 provides that a local church could opt out of a property provision of the Book of Order (BOO) within eight years after the 1983 formation of the Presbyterian Church in the United States of America (PCUSA) if the local church was not "subject to a similar provision of the Constitution of the church of which it was a part" prior to that formation. Although the property trust provision in § 6.3 of the prior 1982 PCUS Book of Church Order (BOCO) is indeed substantially similar to BOO § G-8.0201, the majority misses the full import of the similarity requirement.

G-8.0701 allows a church to be excused from a provision in that chapter of the Book of Order that is *not* substantially similar to a provision of its prior governing constitution. As the two purported express trust provisions in the Book of Order and [Timberridge's] prior governing constitution (The Book of Church Order) *are* substantially similar, this could only mean that G-8.0701 provided [Timberridge] a means of opting out of G-8.0501, which requires the presbytery's authorization to sell, mortgage, or encumber property, since that provision is in sharp contrast to § 6-8 of The Book of Church Order, which allowed a church to buy, sell, or mortgage "property of that particular church [in the conduct of *its* affairs as a church of the PCUS]." . . . "[T]he unfettered right to dispose of all of one's property is mutually exclusive of any right by a third party to dictate the disposition of that same property." (Emphasis supplied in part.)

*Carrollton Presbyterian Church v. Presbytery of South Louisiana of the Presbyterian Church (USA)*, supra at 981. Although the Louisiana court did not cite authority in support of this neutral principle of law, it is consistent with the recognition of numerous courts and treatises that a trust fails if the trustee has absolute or uncontrolled discretion to dispose of the property, especially where, as here, the trustee is granted the power to use the property for its own benefit. George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, *The Law of Trusts and Trustees* § 162; 55A Fla. Jur. 2d *Trusts* § 31. See also Restatement (Second) of Trusts § 125 (1959) ("If property is transferred to a person to be disposed of by him in any manner . . . , no trust is created and the transferee takes the property for his own benefit."); 10 Ga. Jur. *Decedents' Estates and Trusts* § 17:10 (prior to Revised Georgia Trust Code of 2010, merger of legal and equitable interests resulted where single trustee was also the sole beneficiary).

"In other words, in allowing [Timberridge] to fall back on § 6-8, G-8.0701 negated any express trust as provided by G-8.0201." *Carrollton Presbyterian Church v. Presbytery of South Louisiana of the Presbyterian Church (USA)*, supra at ___. Thus, the majority completely misapplies BOO §§ G-8.0201 and G-8.0701, on which it so heavily relies. Furthermore, the majority's observation that the *Carrollton* court relied on Louisiana trust statutes is immaterial, as it did so only as part of an alternative holding "even if [it was] not persuaded that [the local church] is exempt from the Book of Order's express trust provision." *Carrollton Presbyterian Church v. Presbytery of South Louisiana of the Presbyterian Church (USA)*, supra at 981. Because of the ultimate negation of § G-8.0201 with respect to

Timberridge, the majority is left with wholly insufficient evidence that Timberridge's property is held in trust for the general church.

Moreover, even if the property trust provision has not been negated in accordance with the analysis of the Louisiana court, a crucial element for the existence of a trust is still not present in this case. That element is the intent of the settlor, which must be ascertained with reasonable certainty for an express trust to exist. OCGA § 53-12-20 (b) (1). Alternatively, it must be "implied from the circumstances" for an implied trust to exist. Former OCGA § 53-12-2 (3) (as it read prior to passage of the Revised Georgia Trust Code of 2010). Furthermore, even assuming that the majority has appropriately declined to apply Georgia's generic express or implied trust statutes, the same requirement of the settlor's intent nevertheless is found in the neutral principles approach, as articulated in *Jones v. Wolf*, 443 U. S. 595, 603-606 (III) (99 SC 3020, 61 LE2d 775) (1979):

> [T]he neutral-principles analysis shares the peculiar genius of private-law systems in general — flexibility in ordering private rights and obligations to reflect the *intentions of the parties*. . . . [A] religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the *desires of the members*. . . . The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts *in determining whether the document indicates that the parties have intended to create a trust*. . . . Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, *the parties can ensure, if they so desire*, that the faction loyal to the hierarchical church will retain the church property. . . . And the civil courts will be bound to give effect to *the result indicated by the parties*, provided it is embodied in some legally cognizable form. (Emphasis supplied.)

The burden involved in taking the steps suggested by the Supreme Court are minimal, as the majority states, but only if appropriate steps are taken before a dispute erupts and only if both parties have the requisite intent to create a trust. *Jones v. Wolf*, supra at 606 (3). Although the majority acknowledges this intent requirement in passing, it seriously errs by failing to apply that requirement in its

examination of the relevant documents.

The intention of Timberridge Presbyterian Church (Timberridge), as the local church, cannot be discerned by consideration of either the 1982 amendment to the Book of Church Order or the 1983 Book of Order. To limit judicial consideration in this manner would effectively constitute an inappropriate deference to church doctrine and reliance on religious precepts, or even an attempted return to the unconstitutional "departure from doctrine" approach. *From the Heart Church Ministries v. AME Zion Church*, 803 A2d 548, 569-570 (III) (Md. 2002). Although the majority does consider relevant documents other than the Book of Church Order or the Book of Order, it does not articulate what it should be looking for. Where, as here, there is neither a dispositive statute nor any deed with clear trust language, a court must look in other documentation or circumstances for the local church's intention to create a trust or to consent to trust provisions in national church documents. *From the Heart Church Ministries v. AME Zion Church*, supra at 570-571 (III).

The Articles of Incorporation for Timberridge Presbyterian Church, Inc. (TPC Inc.) are a remarkably slender reed on which to hang the weight of the majority opinion. The majority relies upon the Articles' reference to the definition of "active member" in the Book of Order but fails to quote the whole definition, which reads as follows:

> An active member of a particular church is a person who has made a profession of faith in Christ, has been baptized, has been received into membership of the church, has voluntarily submitted to the government of this church, and participates in the church's work and worship.

BOO § G-5.0202. This provision is "located outside the property section of the Book of Order." *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States*, 464 NE2d 454, 462 (III) (N.Y. 1984). Like the overall intent of the Book of Order, the purpose of that definition clearly is spiritual. The portion on which the majority relies is that an active member has "voluntarily submitted to the government of" the general church. This provision strongly implies in the context that the member has submitted to the authority of the general church only in spiritual matters. See *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 489 A2d 1317, 1325 (II) (Pa. 1985). See also BOO § G-9.0102 (ascribing to the governing bodies of the general church "only ecclesiastical jurisdiction for the purpose of serving Jesus Christ and declaring and obeying his will in relation to truth and service, order and disci-

pline"). Moreover, the definition of "active member" relates only to individual members, and not to local churches or their relationship with the general church. Thus, judicial inquiry into and application of that definition is both irrelevant and constitutionally foreclosed. See *First Presbyterian Church of Schenectady v. United Presbyterian Church in the United States,* supra.

Furthermore, the prohibition in the Articles of Incorporation on bylaws which conflict with the Book of Order is likewise irrelevant to Timberridge's intent with respect to the property trust provision in the Book of Order. Article IX of the Articles of Incorporation actually prohibits bylaws or amendments thereto which conflict with either the Articles or the Book of Order. Furthermore, Article X permits amendment of the Articles of Incorporation by majority vote of the members and does not prohibit any conflict thereof with the Book of Order. The majority cannot logically insist that Article IX is relevant but that Article X is not. Either both are irrelevant, or both are relevant in opposite ways. If the proscription on conflicting bylaws in Article IX indicates that Timberridge is subject to the Book of Order and its property trust provision, then the omission in Article X of any such proscription on conflicting amendments to the Articles necessarily provides the contrary indication that Timberridge is not subject to the Book of Order or its trust provision. Moreover, because Article IX indisputably does not make the Articles themselves subject to the Book of Order, the absence of any actual amendment to the Articles cannot show that TPC Inc. subjected itself to the Book of Order or its trust provision, especially in light of Article VI. That Article broadly grants TPC Inc. all of the powers conferred by the Georgia Nonprofit Corporation Code, including, but not limited to, the power "to receive, hold, encumber, manage, and transfer property, real or personal; to accept and execute deeds of title to such property; [and] to hold and defend title to such property . . . ." Nothing in the Articles of Incorporation states or implies any intent or consent that Timberridge's property be held in trust for the general church.

In the face of the exceedingly weak or non-existent documentary evidence of Timberridge's intent to hold all of its property in trust for the general church, other relevant documentation and circumstances overwhelmingly prove the absence of any such intent. Timberridge operated for more than 150 years, including over 100 years as a member of the Presbyterian Church in the United States (PCUS), without any property trust provision. As explained by the Court of Appeals, and apparently accepted by the majority, there is no evidence that any representative of Timberridge was aware of or assented to either the adoption of the 1982 property trust amendment to the Book of Church Order or the adoption of the property

trust provision or opt-out clause in the 1983 Book of Order. *Timberridge Presbyterian Church v. Presbytery of Greater Atlanta*, 307 Ga. App. 191, 199 (1) (d) (705 SE2d 262) (2010). It cannot be said that Timberridge voluntarily affiliated with the general church in 1983. The Articles of Agreement providing for the 1983 reunion of the PCUS with the United Presbyterian Church in the United States of America (UPCUSA) mandates that "[e]ach and every congregation of the [PCUS] and of The [UPCUSA] shall be a congregation of the Presbyterian Church (U.S.A.)." Article 1.4. Thus, instead of being required to "opt in," each local church was automatically part of the new general church and was given eight years to petition for dismissal or to seek an exemption from the provisions of the property chapter of the Book of Order.

Timberridge did not wait eight years, but rather acted in four years. In fact, Timberridge acted just two weeks after the last individual owner conveyed her interest in the land to Timberridge, and the Presbytery was promptly notified as required. More important, Timberridge broadly took "the 'property exemption' as provided in the Book of Order (G-8.0700)" and did not limit that notice to a single provision of the property chapter. Most important of all, Timberridge's notice, regardless of the precise application of that chapter's language thereto, constituted Timberridge's only expression of intent with respect to the recently enacted property trust provisions in national church documents. In that prompt notice, Timberridge unmistakably rejected any consent to hold its property in trust for the general church. It is irrelevant that 20 years elapsed thereafter during which Timberridge continued its relationship with the general church until a dispute arose and Timberridge brought suit asserting control of its property. Those circumstances are wholly consistent with the fact that Timberridge, which never expressed any intent to create a trust, was relying on its prompt notice of exemption from property trust provisions as its expression of intent not to create a trust. Compare *Kemp v. Neal*, 288 Ga. 324, 329 (2) (704 SE2d 175) (2010); *Holiness Baptist Assn. v. Barber*, 274 Ga. 357, 359 (552 SE2d 90) (2001); *Crumbley v. Solomon*, 243 Ga. 343, 345 (254 SE2d 330) (1979); *Rector, Wardens and Vestrymen of Christ Church in Savannah v. Bishop of the Episcopal Diocese of Ga.*, 305 Ga. App. 87 (699 SE2d 45) (2010) (where local church recorded charter making it subject to national church's canons, reaffirmed such accession after enactment of property trust canon, took no steps to disavow that canon for 30 years, and sought permission to sell or incur indebtedness on property), aff'd, 290 Ga. 95 (717 SE2d 237) (2011).

In sum, the majority erroneously rejects the most relevant precedent, which demonstrates the negation of the property trust

provision in § G-8.0201 by § G-8.0701. Moreover, the majority disregards a basic principle of trust law which is subsumed in the "neutral principles" approach to church property disputes, and Timberridge proved that it never intended to place any of its property in trust for the general church or in any way to consent to trust provisions in national church documents. Accordingly, I can only conclude that the Court of Appeals correctly reversed the trial court's grant of summary judgment in favor of the Presbytery, and I therefore respectfully dissent.

I am authorized to state that Chief Justice Hunstein joins in this dissent.

BENEFIELD, Judge, dissenting.

The courts have virtually ignored the summary judgment standard in church property disputes thereby giving little credence to the opportunity for the parties to have a jury, as opposed to a judge, decide the issues. *Carnes v. Smith*, 236 Ga. 30 (222 SE2d 322) (1976); *Rector of Christ Church v. Bishop of the Episcopal Diocese of Ga., Inc.*, 305 Ga. App. 87 (699 SE2d 45) (2010), aff'd 290 Ga. 95 (718 SE2d 237) (2011), as well as this case. "[The] civil courts use 'neutral principles of law,' i.e., statutes, charters, relevant deeds of conveyance, and the organizational constitutions and bylaws of the denomination, to resolve hierarchical church property disputes." *Kemp v. Neal*, 288 Ga. 324, 326 (704 SE2d 175) (2010) (plurality). Therefore, the *only* forms of evidence to be considered in these cases are deeds, statutes, and local and national church documents leaving little to no room for parol evidence as to the uniquely factual issue of intent.[9]

There are church property cases decided solely on the national church's documents demonstrating the grantor's intent by looking at the beneficiary's impression of a trust, apparently due to the alleged grantor's "affiliation" with the national church and the purported "benefits" enjoyed by the grantor thereby. *Kemp*, supra at 328-329; *Crumbley v. Solomon*, 243 Ga. 343, 344-345 (254 SE2d 330) (1979); *Carnes*, supra. Affiliation with the national church, and purported benefits of it, have not been articulated as a neutral principle of law. Inasmuch as this "affiliation" is not a deed, statute or church document and it is being relied on to demonstrate intent,

---

[9] Apparently, the courts recognize an unacknowledged fifth form of evidence and that is the local church's alleged acceptance of benefits from the greater church. "Because [the local congregation] remained a member of the [greater church] and accepted the benefits flowing from that relationship, it cannot now deny the existence of a trust for the benefit of the general church." *Crumbley v. Solomon*, 243 Ga. 343, 345 (254 SE2d 330) (1979). Also see Maj. Op. at 275. Local churches sometimes deny the value of the purported benefits received. *Carnes*, supra (the local church separated from the general church because they were not granted a full-time pastor).

perhaps it creates a genuine issue of material fact assuming opposing affidavits to the contrary as in this case. (See affidavits of Dan Patterson, a trustee of TPC, Inc., and Michael L. West, the CEO of TPC, Inc.) Conversely, it is perhaps a judicial acknowledgment that it is insufficient to decide these critical cases on deeds, statutes and church documents alone.

Often the deeds (or land grant) do not establish a trust holding the property for the greater church. See *Carnes*; *Christ Church*; *Kemp* and *Crumbley*, supra. In determining intent, this is viewed as irrelevant, "neutral" or in some roundabout way proof of the grantor's intent. As the majority opinion notes, "[i]t is true that [the deeds do not] show an intent by the grantors to create a trust." Maj. Op. at 277. When in truth, it was either created or it was not and a review of the deed would quickly demonstrate which was true. The majority continues "[b]ut [the deeds] also do not expressly preclude the creation of one. Given [the provision in the national church's constitution] Timberridge would have no reason to believe that its deeds needed to recite a trust in favor of the general church. . . ." Id.; see also *Christ Church*, supra at 89-90. It would seem just as easily to follow that Timberridge had no intention of creating a trust since it did not provide one in the deeds as it easily could have. What would be the purpose of including language "this instrument does not create a trust" in a deed?

The statutes are also generally found to be inapplicable, *Kemp*, supra, or as the majority states, unnecessary or inappropriate in the resolution of this case. In reversing the Court of Appeals, the majority concludes that "the fact that a trust was not created under our state's generic express . . . trust statute[ ] does not preclude the implication of a trust on church property under the neutral principles of law doctrine." Maj. Op. at 281. Presumably, it would also not compel the implication of a trust. The majority minimizes reliance on OCGA § 53-12-20, Georgia's express trust statute, even as persuasive authority, and strongly criticizes the Court of Appeals for incorrectly relying on it.

Even the majority takes issue with the applicability of OCGA § 14-5-46. As the majority concedes,

[a]lthough the Court of Appeals' reason for not applying [the Code section] was erroneous, we note that this Court and the Court of Appeals have failed to analyze another component of the statutory text in our modern cases, namely, whether the property was conveyed "for the purpose of *erecting* churches or meeting houses."

(Emphasis in original.) Maj. Op. at 278-279.

Nonetheless, the majority looks to OCGA § 14-5-46 as an expression of "this State's policy of looking to 'the mode of church government or rules of discipline' in resolving church property disputes, even when the statutory text does not squarely apply." Id. at 279. This argument begs the question why OCGA § 53-12-20 cannot likewise be used, at a minimum, as an expression of the State's policy.

Despite its apparent inapplicability, the majority asserts that OCGA § 14-5-46 "weigh[s] in favor of the trial court's judgments under our precedents . . . ," id. at 279, yet does not concede that OCGA § 53-12-20 weighs against those judgments demonstrating the bias of "neutral principles of law" as it has evolved in favor of the national church.

The majority relies on Timberridge's Articles of Incorporation to demonstrate its intent to establish a trust in favor of PCUSA. Without deeds and statutes to resolve the dispute all that is left to the majority are the respective church's documents. Since the majority interprets Timberridge's Articles of Incorporation to "unequivocally submit Timberridge *and its property* to the PCUSA as its governing authority," (emphasis supplied), id. at 282, it is necessary to review them.

In Division 1 the majority quotes a portion of Article 4 of the Articles of Incorporation of Timberridge Presbyterian Church, Inc., which states the corporation is "to be a church institution which is a member of the Presbytery of Atlanta of the [PCUSA], or any successor Presbytery thereof." Further examination of the Article shows that use of the quoted sentence violates the neutral principles of law doctrine and should not have been relied upon by the majority in finding the intent of Timberridge as it began by stating the "purposes for which the Corporation is organized are the proclamation of the Gospel for the salvation of humankind . . ." which deviates from the role of civil courts to decide these disputes without reference to ecclesiastical matters.[10]

The majority then quotes the requirement found in the Articles of Incorporation, that "the corporation's members must be 'active members' of Timberridge 'as defined in the Book of Order of the (PCUSA),' which defines an 'active member of a particular church'

---

[10] The majority reproaches the dissenters for quoting ecclesiastical portions of the church documents, however, the quotes are an effort to demonstrate it is the majority that is delving into, and relying on, ecclesiastical matters in their decision and not the dissenters. As noted by the dissent in *Jones v. Wolf*, 443 U. S. 595, 612 (99 SC 3020, 61 LE2d 775) (1979), church documents "tend to be drawn in terms of religious precepts. Attempting to read them 'in purely secular terms' is more likely to promote confusion than understanding." By parsing out the secular terms from the scriptural references in the national church's Book of Order, the majority has purportedly found the local church's intent thereby creating bias for the national church, rather than a true understanding of the intent of both parties.

to be a person who has 'voluntarily submitted to the government of this (general) church.' " Citing § G-5.0202. Maj. Op. at 282. The quote relied on by the majority has a footnote defining the term "government" by citing two biblical passages.[11] Therefore, it is artful for the majority to say they are not quoting the biblical portions of the PCUSA's Constitution. Furthermore, as Presiding Justice Carley points out in his dissent, this definition of "active member" is outside of the property section of the Book of Order and again sounds in spiritual terms.

The majority's contention that Timberridge's articles "unequivocally submit Timberridge and its property to PCUSA as its governing authority," Maj. Op. at 282, is tempered by the majority's admission that Timberridge may not have rendered itself subject to the authority of PCUSA "in *all* temporal matters." (Emphasis in original.) Id. at 283. A review of the Book of Order demonstrates there is not an area of church governance, including temporal matters, that is not addressed. Nonetheless it is "clear" to the majority that "[b]y adopting these Articles of Incorporation, TPC Inc., with unmistakable clarity, agreed to bind itself to," id., the Book of Order's explicit property trust provision. This conclusion is particularly troublesome since they rely heavily on the national church's constitution, as opposed to simply relying on the articles, to reach this conclusion.

The majority maintains that "[o]ur decision derives from the specific language of the governing documents adopted by the local and national churches, supported by the policy reflected in OCGA § 14-5-46 and not contradicted by the deeds at issue." Id. at 288. Could the majority not as easily declare that "[o]ur decision derives from the specific language of the governing documents . . . supported by the policy of OCGA § 53-12-20 and not contradicted by the deeds at issue?"

In finding intent neither the trial court, the Court of Appeals nor the majority have cited the summary judgment standard.[12] It is also true that neither of the parties have argued that summary judgment was inappropriate in this case. This may be because the "neutral

---

[11] "They serve at a sanctuary that is a copy and shadow of what is in heaven. This is why Moses was warned when he was about to build the tabernacle: 'See to it that you make everything according to the pattern shown you on the mountain.' " Heb. 8:5. (NIV) "Peace and mercy to all who follow this rule, even to the Israel of God." Gal. 6:16. (NIV)

[12] Where this dissenter stands alone, as characterized by the majority, is not whether summary judgment should be granted under the current application of the neutral principles of law doctrine, rather it is whether the law should be changed to permit additional types of evidence to show the intent of both parties. As noted by the dissent in *Jones v. Wolf,* " 'the neutral principles of law' approach operates as a restrictive rule of evidence," at least in its current incarnation. See *Jones,* 443 U. S. at 611.

principles of law" construct, as it has evolved in this state, virtually eliminates any genuine and material issues of fact by foreclosing parol evidence as to intent despite the "affiliation" argument.[13] As a result, we have institutionalized "trial by judges" in the area of church property cases.

The majority argues that the application of the neutral principles of law doctrine does not create a bias for the national church and it allows this Court to be "even handed" in resolving church property disputes. This argument is a paternalistic assurance to the parties that the courts have developed a system to resolve church property disputes without the bothersome need of a jury. After all, juries may tread on the church's first amendment rights. Trust us. We know best.

As quoted in Justice Carley's dissent in *Kemp*, supra, 288 Ga. at 332, "[t]he majority's determination that a hierarchical church can unilaterally impress a trust in its favor of local congregational property depends on dicta from *Jones v. Wolf*, . . . but effectively ignores"

> the important qualification in the *Jones v. Wolf* dicta that the obligation of civil courts is to honor "the result indicated by the parties." [Cit.] In simpler language, civil courts must give effect to bilateral agreements, and a unilateral declaration of trust by the putative beneficiary is not a bilateral agreement. . . . [The majority's] decision to grant hierarchical churches a unique authority to impress a trust upon property they do not own merely by declaring that the church is the trust beneficiary of that property is [a] . . . startling cession of governmental power to a religious organization. Calvin Massey, Church Schisms, Church Property, and Civil Authority, 84 St. John's L. Rev. 23, 46-49 (III) (2010).

Despite this, the majority in the case sub judice states their decision is "based . . . on the sort of legal materials 'familiar to lawyers and judges,' embodied in a 'legally cognizable form,' and having nothing to do with the church's religious doctrine," quoting *Jones v. Wolf*. Maj. Op. at 288. In what non-church property case is the grantor's intent found solely in a self-serving document created by the grantee determined to be a "legally cognizable form"?

---

[13] In the majority's response to this dissent, no mention was made as to how evidence of the local church's "affiliation" with the national church fits into the tight construct of the neutral principles of law doctrine and how they can rely on it as a matter of law when it is a fact that is in dispute in this case.

Calvin Massey's quote in the *Kemp* dissent goes on to provide:

This is . . . the . . . extraordinary power to seize property by divesting others of their beneficial interests in the property. . . . Donors of property to local churches are not necessarily members of the hierarchical church. Such donors have no assurance that their intent to transfer property in trust for the exclusive benefit of the local church, and not the hierarchical church, will be honored. All the general church would need to do is alter its own internal governing instruments to nullify the explicit intentions of donors.

Granted, the Court in *Kemp* decided the case solely on one page of the national church's constitution and though it may be argued that there is more evidence of intent in this case, the point is that the church's property is being taken as a matter of law and not by the consideration of intent by a jury.

Perhaps it is time to acknowledge that the "neutral principles of law" approach as it has evolved creates a bias for the national church and it is time to correct its application so that we can truly look for, as well as fairly determine, the real intent of the parties. There is no clearer example of the need for this correction than the per curiam decision in the *Kemp* case. In *Kemp*, the real property of a local church was awarded to the national church based upon one page of its Book of Discipline and the "affiliation" of the local church with the greater one. Presiding Justice Carley's dissent pointed out that "the local church obtained title long before adoption of the trust provision on which the majority relies." *Kemp*, supra at 332. There were no deeds of conveyance, the statutes were inapplicable and there were no local church documents. Affidavits of two long-time church members averring that there was no question concerning the local church's right of ownership of the property, given to a bank to obtain a loan upon which the bank relied in accepting a deed to secure the promissory note, *Kemp*, supra, n. 2, were presumably not considered because they were not relevant to the application of the neutral principles of law doctrine. "When a local church has a relationship with a national church and accepts the benefits afforded to it as a result of that relationship, the local church cannot deny the existence of a trust for the national church as recited in the constitution of the national church."[14] (Citations omitted.) *Kemp*,

---

[14] The local church denied receiving such benefits and, ironically, when the local church argued that as a result the "trust was breached," the *Kemp* Court stated: "We know of no neutral principle of law that embodies appellants' position, and civil courts may not rely on doctrinal concerns or ecclesiastical principles when deciding disputes between churches."

supra at 329. Based on *one page* of the Book of Discipline[15] and the local church's "affiliation" with the national church, the local church lost its property to the national church. Is this the even-handedness of which the majority speaks?

This Court, as the highest court in Georgia, is, and has been, appropriately concerned with protecting the church's first amendment rights to freedom of religion and the establishment of churches. However, it appears by applying the neutral principles of law construct as it is currently employed, the parties are being denied the right to a jury trial. Churches should not be required to give up one right to protect another.[16]

By implementing the neutral principles of law in this way, we have not earnestly looked for the intent of *both* parties. And if we have not, then we have failed not only the pew sitters in the particular churches, but also the overriding directive of *Jones v. Wolf* to resolve church property disputes by ascertaining " 'the intention of the parties'. . . regarding beneficial ownership of the property at issue as expressed . . . in a 'legally cognizable form.' "

The majority opines that "Judge Benefield's dissent cites no precedent that supports her position," Maj. Op. at 286, and by doing so ignores the point of this dissent. This Court can change, or evolve, the neutral principles of law construct and I am suggesting that it should and, for that, *Jones v. Wolf* provides the precedent: "a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters." (Emphasis added.) *Jones v. Wolf*, supra at 602. For the reasons stated in this dissent, it is time to reform the standard employed.

DECIDED NOVEMBER 21, 2011 —
RECONSIDERATION DENIED DECEMBER 8, 2011.

*Wilson, Morton & Downs, Robert E. Wilson, Debra A. Golymbieski*, for appellant.

*Talley, French & Kendall, Michael C. Kendall, Maureen E. Murphy*, for appellee.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, David H. Gambrell, Linda A. Klein, John Hinton IV, Gallagher Sharp, Forrest*

---

*Kemp*, supra at 329-330.

[15] It was the only portion of the Book of Discipline placed in the record by the parties.

[16] See *Culpepper v. State*, 132 Ga. App. 733 (209 SE2d 18) (1974) (a defendant's testimony at a motion to suppress could not be used against him in the State's case at trial because that would force him to forfeit a valid Fourth Amendment claim or waive his Fifth Amendment privilege against self-incrimination).

*A. Norman, Weil, Gotshal & Manges, Christopher J. Cox, Alexandra Fellowes, Bell & Brigham, John C. Bell, Jr., Hull Barrett, David E. Hudson, Patrick J. Rice, McNatt, Greene & Peterson, Hugh B. McNatt, Tucker, Everitt, Long, Brewton & Lanier, Thomas W. Tucker, John B. Long, A. Montague Miller*, amici curiae.