No. 114,404

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

HEARTLAND PRESBYTERY,
*Appellee/Cross-appellant*,

v.

THE PRESBYTERIAN CHURCH OF STANLEY, INC.,
*Appellant/Cross-appellee*.

SYLLABUS BY THE COURT

1.

The acquiescence doctrine establishes that parties who voluntarily accept the benefit or burden of a judgment lose their right to appeal.

2.

Parties waive their right to appeal if their actions clearly and unmistakably show an inconsistent course of conduct or an unconditional, voluntary, and absolute acquiescence. However, a waiver is not implied from measures that parties take to protect their rights following the entry of judgment.

3.

The First Amendment to the United States Constitution and Section 7 of the Kansas Constitution Bill of Rights prohibit the government from interfering with a person's right to freely exercise his or her religious beliefs. In addition, the government is prohibited from compelling a person to support a particular religion or form of worship.

1

4.

The First Amendment allows hierarchical religious organizations or denominations to establish their own rules and regulations for internal governance and to create tribunals for adjudicating disputes that arise within the organization.

5.

Where a local congregation voluntarily affiliates with a hierarchical religious organization or denomination in accordance with the rules of that church body, church law governs the right of dominion, control, and disposal of church property.

6.

In cases involving disputes over the ownership or control of church property arising out of a schism, civil courts will take jurisdiction only to assure the regularity of business practices and to protect the right of private use and ownership of property.

7.

In cases involving a church property dispute arising out of a schism in a congregation affiliated with a hierarchical religious organization or denomination that has established internal tribunals for the resolution of internal disputes, Kansas courts apply the principle of hierarchical deference.

8.

Under the hierarchical deference approach, civil courts must defer to the decision of the highest tribunal of the hierarchical church body to which the issue has been presented.

9.

In applying the hierarchical deference approach in cases involving a property dispute arising out of a schism in a local congregation affiliated with a hierarchical

denomination, Kansas courts should answer three questions from a secular perspective: (1) Was the congregation affiliated with a hierarchical church body or denomination prior to the schism? (2) Does the hierarchical church body or denomination have its own rules and procedures for the resolution of property disputes arising out of a schism within its congregations? and (3) Has there been a determination of the property dispute by the highest tribunal of the hierarchical church body or denomination to which the issue has been presented? If the answers to each of these questions is in the affirmative, then a civil court must accept the decision of the church tribunal as binding.

10.

Lower courts are duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position.

Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed February 17, 2017. Affirmed.

*J. Brett Milbourn* and *R. Keith Johnston*, of Walters Bender Strohbehn & Vaughan, P.C., of Kansas City, Missouri, for appellant/cross-appellee The Presbyterian Church of Stanley, Inc. (Dennis Hamblin, Steve Lemieux, and Kay Sprouse).

*Lee M. Smithyman*, of Smithyman & Zakoura, Chartered, of Overland Park, for The Presbyterian Church of Stanley, Inc.

*Allan V. Hallquist* and *Christina M. Pyle*, of Husch Blackwell LLP, of Kansas City, Missouri, for appellee/cross-appellant Heartland Presbytery.

Before STANDRIDGE, P.J., ARNOLD-BURGER and BRUNS, JJ.

BRUNS, J.: This case involves a church property dispute arising out of a schism that developed between the members of the Presbyterian Church of Stanley, Inc. (PCOS). Since 1983, the PCOS has been affiliated with the Presbyterian Church (U.S.A.), which is

a hierarchical religious denomination. Unfortunately, a disagreement arose between the members of the congregation relating primarily to certain theological positions taken by the Presbyterian Church (U.S.A.) over the past several years. In 2014, a majority of the members present at a congregational meeting voted to have the PCOS leave the Presbyterian Church (U.S.A.)—referred to as the "leaving" faction—while a minority of the members present at the meeting voted to continue its affiliation with the denomination—referred to as the "staying" faction.

Heartland Presbytery—a governing arm of the Presbyterian Church (U.S.A.)—brought this quiet title and declaratory judgment action in an attempt to preserve the congregation's property for the use and benefit of the staying faction, whose members desire for the PCOS to remain in fellowship with the Presbyterian Church (U.S.A.). In response, the leaving faction filed a counterclaim seeking similar relief on behalf of those who voted for the PCOS to disaffiliate from the Presbyterian Church (U.S.A.). Although the district court found that the PCOS did not hold its property in trust for the Presbyterian Church (U.S.A.), it deferred to a determination issued by a tribunal of Heartland Presbytery that those members who desire to continue the PCOS's affiliation with the Presbyterian Church (U.S.A.) are entitled to the disputed church property.

Shortly after they filed a notice of appeal, the appellants—and others who desired to have the congregation disaffiliate from the Presbyterian Church (U.S.A.)—resigned as members of the PCOS and started a new congregation affiliated with a different denomination. On appeal, we find that the appellants did not acquiesce or waive their right to appeal by exercising their right to leave the congregation after the district court entered its judgment. Turning to the merits, we find that the district court correctly applied the principle of hierarchical deference—which has long been recognized in Kansas—in determining which of the two factions should have control of the property of the PCOS following the schism. Furthermore, we find that there is no reason for Kansas

4

courts to retreat from the hierarchical deference approach in resolving church property disputes arising out of a schism. Thus, we affirm the district court's decision.

FACTS

The PCOS congregation originally formed in 1979, at which time it was affiliated with two hierarchical church bodies—the United Presbyterian Church in the United States of America (UPCUSA) and the Presbyterian Church in the United States (PCUS). In 1983, the UPCUSA and the PCUS merged to form the Presbyterian Church (U.S.A.)—hereafter referred to as "PCUSA". Similar to the two denominations from which it was formed, the PCUSA is also a hierarchical church body. Consequently, the PCOS has been officially affiliated with the PCUSA for more than 33 years.

The PCOS, throughout its history, has also been part of what is now known as Heartland Presbytery—the governing arm of the PCUSA that is composed of congregations in metropolitan Kansas City. Prior to 1983, Heartland Presbytery was named the Kansas City Union Presbytery because it served both the UPCUSA and the PCUS. In the late 1970s, the Kansas City Union Presbytery began efforts to plant a mission congregation in southern Johnson County that would eventually become the PCOS.

On December 3, 1978, the Kansas City Union Presbytery began holding worship services in the basement of the Bank of Stanley. A part-time pastor supplied by the Presbytery led the services. The following month, the Presbytery approved a petition signed by 27 families requesting that a commission be established to officially organize the congregation. On May 5, 1979, the Presbytery purchased 5.8 acres of land located near 148th and Antioch in Johnson County as a building site for a new congregation. Finally, on August 10, 1979, the PCOS was officially incorporated in the State of Kansas.

5

The Articles of Incorporation filed by the PCOS in 1979 stated:

> "This corporation is organized for the purpose of supporting worship of Almighty God and instruction in the Christian religion, according to the Constitution of The United Presbyterian Church in the United States of America and the Presbyterian Church in the United States."

Likewise, the bylaws approved by the PCOS in 1979 provided:

> "The by-laws of the Presbyterian Church of Stanley as a corporation shall always be subject to the Constitution and laws of the State of Kansas, and also to the Constitution of the United Presbyterian Church in the United States of America and the Presbyterian Church in the United States."

In February 1983, Pastor Richard Ramsey and a lay member of the PCOS participated in a meeting of the Kansas City Union Presbytery. At the meeting, a Plan of Reunion, which provided for the merger of the UPCUSA and the PCUS, was unanimously approved. The Plan of Reunion also adopted the proposed Constitution of the PCUSA, which includes the *Book of Confessions* and the *Book of Order*. The *Book of Confessions* sets forth the core doctrinal beliefs of the PCUSA, including the Nicene Creed, the Apostles' Creed, the Scots Confession, the Heidelberg Catechism, the Second Helvetic Confession, the Westminster Declaration of Barmen, the Confession of 1967, and a Brief Statement of Faith. The *Book of Order* sets forth the Foundations of Presbyterian Polity, the Form of Government, the Directory for Worship, and the Rules of Discipline.

The *Book of Order* provides that "the congregations of the [PCUSA] wherever they are, taken collectively, constitute one church, called the church." As a hierarchical denomination, officials of successive ranks govern the PCUSA. At the congregation level, voting members elect a council known as the Session, which is composed of lay elders and the pastor or pastors. In turn, the Presbytery governs the congregations in a

particular geographic district. Next, a group of presbyteries in a region is called a Synod. Finally, the ultimate authority in the PCUSA rests with the General Assembly, which is made up of commissioners elected by the presbyteries.

Among other things, the *Book of Order* states that

"[a] 'congregation' . . . refers to a formally organized community chartered and recognized by a presbytery as provided in this Constitution. *Each congregation of the Presbyterian Church (U.S.A.) shall be governed by this Constitution.* The members of the congregation put themselves under the leadership of the session and the higher councils (presbytery, synod, and General Assembly)." (Emphasis added.)

In the *Book of Order*, the PCUSA directs its congregations to form a corporation where permitted to do so by civil law. Moreover, the *Book of Order* provides that a congregation organized as a corporation has the power "to receive, hold, encumber, manage, and transfer property, real or personal, for the congregation . . . *all subject to the authority of the session and under the provisions of the Constitution of the Presbyterian Church (U.S.A.).*" (Emphasis added.) The *Book of Order* further states that the property owned by a congregation "is a *tool for the accomplishment of the mission of Jesus Christ* in the world." (Emphasis added.)

In addition, the *Book of Order* provides:

"All property held by or for a congregation . . . whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a congregation or of a higher council or retained for the production of income, *is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).*" (Emphasis added.)

Regarding the resolution of disputes between factions over "Property of Congregation in Schism," the *Book of Order* states:

"*The relationship to the [PCUSA] of a congregation can be severed only by constitutional action on the part of the presbytery* [citation omitted]. If there is a schism within the membership of a congregation and the presbytery is unable to effect a reconciliation . . . *the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the [PCUSA].* This determination does not depend upon which faction received the majority vote within the congregation at the time of the schism." (Emphasis added.)

For many years, the PCOS flourished as a congregation of the PCUSA and Heartland Presbytery. By 2014, the congregation had grown to more than 1,000 members. Moreover, until the disputes developed that ultimately led to the schism, the PCOS, the PCUSA, and Heartland Presbytery worked closely together on such things as purchasing property, obtaining loans, and funding mission projects. The PCUSA and Heartland Presbytery also approved, ordained, and installed all of the pastors called to serve the PCOS. Over the years, pastors and lay members of the PCOS served on various committees and commissions of the Presbytery. In addition, pastors and lay members of the PCOS served as commissioners of the Synod of Mid-America and the General Assembly of the PCUSA.

Prior to the schism, the PCOS borrowed money on several occasions and purchased additional land. Until 2013, Heartland Presbytery guaranteed all of the mortgage loans obtained by the PCOS. The maintenance of the property was paid for by the PCOS primarily using donations from its members. As required by the *Book of Order*, the PCOS requested and obtained the Presbytery's approval prior to acquiring or encumbering its real property. Moreover, the PCOS submitted the minutes of its Session meetings to the Presbytery for review and approval as required by the *Book of Order*.

Unfortunately, the relationship between the PCOS, the PCUSA, and Heartland Presbytery began to deteriorate over the past several years as many of the congregation's members became disillusioned with certain theological positions taken by the PCUSA.

8

These positions—identified in a document prepared by the Session of the PCOS entitled *"The PC (USA) and PCOS:  Where We Stand"*—related to core ecclesiastical issues including the divinity of Jesus Christ, the exclusivity of Christianity for salvation, and the authority of Scriptures. In addition, disputes also arose over the PCUSA's teachings on human sexuality and other related issues.

In 2011, a small group of members at the PCOS began discussing these doctrinal concerns as well as the possibility of withdrawing from the PCUSA. On October 2, 2011, the PCOS amended its bylaws—evidently without informing Heartland Presbytery. The 2011 bylaw amendments struck the language from the 1979 bylaws that provided that the PCOS "as a corporation shall always be subject to the Constitution and laws of the State of Kansas, and also the Constitution of the [UPCUSA] and the [PCUS]." This wording was replaced with language stating that in matters of civil law and corporate governance, the PCOS would be subject to the laws of the State of Kansas but that the PCOS would be "governed in ecclesiastical and spiritual matters of order and structure by the Constitution of the [PCUSA]."

In August of 2013, the PCOS refinanced its mortgage with a private bank as opposed to refinancing with the Church Development Corporation as it had when refinancing in the past. Heartland Presbytery approved the refinancing but had no knowledge that the PCOS represented to the bank that the property was not subject to any liens, encumbrances, or defects of any nature. A few months later, the Session decided to enter into a period of formal discussions within the congregation regarding the relationship between the PCOS and the PCUSA. About that time, the document entitled *"The PC (USA) and PCOS:  Where We Stand"* was distributed to members of the congregation. It presented the possibility of seeking "a new denominational affiliation" and stated that "[a]s our denomination moves further away from the authority of the Bible as God's infallible Word, and Jesus Christ as the only way to salvation, we find ourselves increasingly out of step with our partner congregations."

In early 2014, the Session held a series of meetings with members of the PCOS to discuss the question of whether the congregation should take steps to sever its affiliation with the PCUSA. Around the same time, a group of members who did not want to withdraw from the PCUSA distributed a document entitled *"Stay"* in which they stated reasons why the PCOS should continue its affiliation with the denomination. Additionally, several members of the PCOS filed a complaint with Heartland Presbytery alleging that the Session had taken action that was prohibited by the *Book of Order*.

In August 2014, the Session voted to recommend to the congregation that the PCOS "disaffiliate" from the PCUSA. The Session also recommended that the PCOS consider affiliation with the ECO: Covenant Order of Evangelical Presbyterians (ECO). The ECO is a relatively new denomination established in 2012 by former members of the PCUSA who also had concerns about certain theological positions the national church body had taken. Moreover, the Session scheduled a congregational meeting on October 5, 2014, to consider these issues.

On July 22, 2014, a group of members of the PCOS who did not support the Session's move towards ending the congregation's affiliation with the PCUSA filed a complaint with the Permanent Judicial Commission of Heartland Presbytery. In the complaint, the group alleged that the PCOS Session had engaged in multiple irregularities, including violations of the *Book of Order*, by taking action to lead the congregation to sever its affiliation with the PCUSA. In particular, the complaint requested that the Permanent Judicial Commission direct the Session to cease and desist any actions found to be inconsistent with the Constitution of the PCUSA.

As authorized by the *Book of Order*, Heartland Presbytery appointed an Administrative Commission to act on its behalf in addressing issues related to the PCOS. On August 28, 2014, the Permanent Judicial Commission issued a Stay of Enforcement in which it ordered the Session of the PCOS to suspend the upcoming congregational

10

meeting. The same day, it was decided that the Administrative Commission should assume jurisdiction over the congregation.

On August 29, 2014, the Administrative Commission sent a letter to the Session advising that it had assumed jurisdiction over the congregation and directing that certain items necessary for the continued operation of the PCOS be turned over to the Commission. In response, the Session and the Board of Trustees of the PCOS advised the Administrative Commission that they would not comply with its directions. They also informed the Commission—through an attorney—that they disavowed the Constitution of the PCUSA to the extent that it speaks to issues regarding ownership of church property. The Session of the PCOS also filed an Objection to Stay of Enforcement with the Permanent Judicial Commission.

On September 10, 2014, an Administrative Commission of the Heartland Presbytery determined that there was a schism within the membership of the PCOS. Furthermore, the Commission declared that those members of the PCOS who continue to remain faithful to the teachings of the national church body and who abide by the *Book of Order* constitute the true church within the PCUSA. A few weeks later, the Commission also took action to dissolve the pastoral relationship between the Reverend Eric Laverentz and the PCOS for his role in advocating for the congregation's separation from the PCUSA and in denying the authority of the Permanent Judicial Commission to issue the Stay of Enforcement.

Notwithstanding the action taken by Heartland Presbytery and the fact that the *Book of Order* does not allow a congregation to disaffiliate from the PCUSA by a vote of the congregation, an election was held on October 5, 2014. Of those voting at the meeting, 348 members voted in favor of the congregation withdrawing from the PCUSA and 94 members voted in favor of the congregation continuing its affiliation with the

11

PCUSA. Although the numbers were slightly different, the majority present at the meeting also voted in favor of the congregation joining the ECO.

At no point, however, has Heartland Presbytery taken action to sever the relationship between the PCOS and the PCUSA. Likewise, neither the PCUSA nor Heartland Presbytery have taken action to ratify the vote taken by the congregation. Instead, the Permanent Judicial Commission held a trial on November 13, 2014. Following the trial, the Permanent Judicial Commission issued a decision determining that:

> "a. The action of the Session to call a congregational meeting for October 5, 2014, for the purpose of 'disaffiliation' is found to have been irregular, and that any actions taken at that meeting or any other such improperly called meeting of the congregation are held to have no binding effect.

> "b. The Session be enjoined from calling any further congregational meeting for the purpose of 'disaffiliating' from [PCUSA] or affiliating with another Reformed body, or changing corporate documents to diminish the relationship of the corporation or the congregation with [PCUSA].

> "c. The Session be enjoined from spending congregational funds for advancement of unconstitutional purposes; from selling, encumbering, or leasing real property without expressed approval of the Presbytery (G-4. 026); and from permitting or directing Trustees to perform these activities.

> "d. The Session comply with duly issued directives of the Administrative Commission."

Heartland Presbytery filed this action in district court seeking a judgment declaring that the real and personal property of the PCOS is held in trust for the use and benefit of the PCUSA. The Presbytery also sought to quiet title to the property in favor of the members of the staying faction who desire to maintain affiliation with the PCUSA. In

response, a counterclaim was filed on behalf of the members of the leaving faction seeking similar relief. Throughout the pretrial stage of the lawsuit, the two factions continued to share the church property. However, worship services and other activities were conducted separately.

The district court held a 2-day bench trial beginning on June 2, 2015. At trial, the parties stipulated to the admission of 350 exhibits. In addition, Heartland Presbytery offered the testimony of two lay members of the PCOS who are part of the staying faction, a member of the Administrative Commission appointed by Heartland Presbytery, and the Executive Presbyter of Heartland Presbytery.

The Executive Presbyter, the Reverend Charles Spencer, testified regarding the position of the PCUSA relating to the property owned by local congregations:

"It is the nature of our denomination that property is understood to belong not to any particular people, but to the whole church, all generations. And in order to protect the present interest in that, we want to make sure that loans are appropriate and safe and secure. And so in order to be good shepherds and stewards of the denomination's interest in a church property, all loans must be approved by the presbytery."

Reverend Spencer also explained the system of adjudicating disputes within the PCUSA:

"All governing bodies above the session have a permanent judicial commission that deals with issues of discipline within the church. They handle two types of cases: One [is] called remedial cases, those cases in which some governing body has acted with some irregularity or deficiency; and then the other is disciplinary cases and that is where an individual is perceived to have acted in some way contrary to scripture [or] the *Book of Confessions*.

. . . .

13

"Governing bodies of the Presbyterian Church are required to conduct their business in accord with the constitution of the church and the terms of the *Book of Order*. And if you fail to do something that you're required to do, it's a delinquency. If you do something you are prohibited from doing, it is an irregularity."

He further testified regarding the PCUSA's internal appeal process:

"[F]irst of all, depending on what the decision is and at what time you raise an objection, you can ask [the] permanent judicial commission to review the work. You can also appeal to the permanent judicial commission of the synod, and if you were displeased with a decision there, you could appeal to the permanent judicial commission of the general assembly."

In their defense, the leaving faction offered the testimony of Reverend Laverentz—who was no longer a member of the PCUSA or the PCOS—and three lay members of the PCOS. Reverend Laverentz testified that it was not his intention to lead the PCOS out of the PCUSA when he became its senior pastor in 2007. By the summer of 2014, however, he had decided that it would be preferable to have the PCOS join another denomination. He candidly admitted that the *Book of Order* did not allow a congregation to unilaterally withdraw from the PCUSA without approval of the Presbytery. Moreover, he recognized that not all of the members of the PCOS wanted the congregation to withdraw from the PCUSA.

On July 15, 2015, the district court issued a comprehensive 40-page memorandum decision, including 85 findings of fact. In the memorandum decision, the district court analyzed the limited role of the courts in church-related property disputes. The district court then examined the two primary approaches to resolving church property disputes approved by the United States Supreme Court—the hierarchical deference approach and the neutral-principles approach. As noted by the district court, the hierarchical deference approach, which was first articulated by the United States Supreme Court in *Watson v. Jones*, 80 U.S. 679, 728, 20 L. Ed. 666 (1871), provides that when a church property

14

dispute has been resolved by the highest judicatory tribunal of a hierarchical church, civil courts must accept such a decision as final and binding. On the other hand, the neutral-principles-of-law approach, which was approved as an alternative option for resolving church property disputes in *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979), provides that civil courts should examine the documents relating to property rights and apply them in a purely secular manner. 443 U.S. at 603-04.

The district court applied the neutral-principles approach to conclude that the PCOS did not hold its property in trust for the use and benefit of the PCUSA. Next, the district court turned to the question of which of the two factions within the PCOS was entitled to control the congregation's property in light of the schism. To answer this question, the district court applied the hierarchical deference approach, finding that this approach had been utilized by Kansas courts in resolving church property disputes for many years. In addition, the district court noted that the 2013 Kansas Legislature had expressly rejected a bill that would have required Kansas courts to abandon the principle of hierarchical deference for a neutral-principles approach in cases involving competing claims to church property. Ultimately, the district court decided that it must defer to the decision of a tribunal of the Heartland Presbytery that the members of the faction desiring to continue the congregation's longstanding affiliation with the PCUSA are entitled to the property of the PCOS.

After the appellants filed a notice of appeal on behalf of the leaving faction, Heartland Presbytery filed a notice of cross-appeal in which it alleged that the district court erred in failing to find that the PCOS held its property in trust for the PCUSA. Two days later, the three named trustees voluntarily resigned as members of the PCOS. Moreover, while this case was pending on appeal, the parties filed several motions with this court. One of the motions sought the dismissal of this appeal on the ground that the leaving faction had acquiesced in the district court's judgment. This motion was assigned to our court's three-judge motions panel, which considers motions filed in cases on appeal

15

that have not yet been assigned to a panel for final decision. Although the motions panel denied the motion to dismiss, the parties were directed "to brief any jurisdictional issues, including acquiescence, for the panel assigned to hear the merits of this appeal."

ANALYSIS

*Issues Presented*

On appeal, there are three primary issues presented. First, whether we should dismiss this appeal because the appellants acquiesced to the district court's judgment regarding the disputed church property. Second, whether the district court appropriately applied the principle of hierarchical deference in deferring to Heartland Presbytery's decision that the members who desire for the congregation to maintain its affiliation with the PCUSA are entitled to the PCOS's property. Third, whether Kansas courts should abandon the hierarchical deference approach in resolving church property disputes arising out of a schism in favor of a neutral-principles approach.

*Acquiescence and Waiver of Right to Appeal*

At the outset, we note that both of the competing factions claim they have the authority to represent the PCOS in this appeal. On the one hand, the appellants—three former trustees of the PCOS who are part of the leaving faction—contend that they continue to represent the interests of the congregation. On the other hand, the staying faction contend that they represent the interests of the congregation. In addition, Heartland Presbytery—who initially filed this action in the district court—not only seeks to protect the interests of the PCUSA but also advocates on behalf of the staying faction.

Both Heartland Presbytery and the staying faction contend that the appellants have waived their right to appeal by acquiescing to the district court's judgment. Specifically, they argue that the three former trustees of the PCOS who are the appellants in this

16

appeal acquiesced to the district court's judgment by voluntarily relinquishing their memberships in the PCOS—and by helping to start a new congregation affiliated with a different denomination—after the notice of appeal was filed. In response, the appellants argue that although "at first blush" their actions may appear to be inconsistent with their challenge to the district court's judgment, they did not intend to abandon their claims relating to the *property* owned by the PCOS. Rather, the appellants argue that they felt compelled in good conscience to renounce their *ecclesiastical* association with the PCOS in light of its continuing affiliation with the PCUSA following the district court's judgment.

The acquiescence doctrine establishes that parties who voluntarily accept the benefit or burden of a judgment lose their right to appeal. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006); see *Hemphill v. Ford Motor Co.*, 41 Kan. App. 2d 726, 728, 733, 206 P.3d 1 (2009). "'The gist of acquiescence sufficient to cut off a right to appeal is voluntary compliance with the judgment.'" *Varner v. Gulf Ins. Co.*, 254 Kan. 492, 494, 866 P.2d 1044 (1994) (quoting *Younger v. Mitchell*, 245 Kan. 204, Syl. ¶ 1, 777 P.2d 789 [1989]). Parties waive their right to appeal only if their actions "'"clearly and unmistakably show an inconsistent course of conduct or an unconditional, voluntary and absolute acquiescence."' [Citations omitted.]" *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 17, 287 P.3d 287 (2012).

"Because acquiescence involves jurisdiction, the matter raises a question of law subject to our unlimited review." *Alliance Mortgage Co.*, 281 Kan. at 1271; see *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 414, 997 P.2d 681 (2000). Whether a party intends to waive his or her legal rights, however, depends on the facts. *Varner*, 254 Kan. at 497. Furthermore, "it is generally the rule that a waiver is not implied from [postjudgment] measures taken by an appellant in defense of and to protect his [or her] rights or interest." *McDaniel v. Jones*, 235 Kan. 93, 104, 679 P.2d 682 (1984); see also *Bank IV Wichita v. Plein*, 250 Kan. 701, 709, 830 P.2d 29 (1992) (postjudgment

17

protective measures taken in the event that the appellate court might affirm the judgment did not waive right to appeal).

In arguing that the appellants acquiesced in the district court's judgment, Heartland Presbytery and the staying faction rely on *Simpson v. Mullineaux*, 188 Kan. 139, 141, 360 P.2d 893 (1961). In *Simpson*, the Kansas Supreme Court found: "It is well settled law that members of a church may not voluntarily withdraw and then endeavor to claim some right in the church property." 188 Kan. at 141. However, it is important to note that *Simpson* did not involve an issue of acquiesce in a district court's judgment. Instead, the members of the congregation who sought to partition church property in *Simpson* had already left and resigned their memberships before filing their lawsuit.

Although *Simpson* is one of many Kansas cases that speak to the issue of which faction should be entitled to control church property following a schism, we find it to provide little—if any—guidance on the issue of acquiescence. In the present case, it is undisputed that the appellants were still members of the PCOS at the time the lawsuit was filed, and they continued to be members of the congregation for a short period after filing this appeal. Likewise, the appellants in this case have consistently maintained a good faith argument that Kansas law relating to church property disputes should be changed and that the will of the majority of the members—now former members—who voted to disaffiliate from the PCUSA should prevail.

As recognized in *Simpson*, the First Amendment to the United States Constitution and Section 7 of the Kansas Constitution Bill of Rights protect the right of all people—including the appellants—"to go to the church of their choice, or to leave such church." 188 Kan. at 142. As such, even though we find this issue to be a close call, we do not find that the actions of the appellants demonstrate that they have unconditionally, voluntarily, and absolutely acquiesced in the district court's judgment. Rather, we find that the actions taken by the appellants following the filing of their notice of appeal can reasonably be

18

classified as measures taken to protect their right to continue to worship according to the dictates of their own consciences in the event that we affirm the district court's judgment. Thus, we conclude that the appellants did not waive their right to appeal.

*Law Applicable to Church Property Disputes in Kansas*

The First Amendment to the United States Constitution states, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Similarly, Section 7 of the Kansas Constitution Bill of Rights states, in part, that "[t]he right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted . . . . " Accordingly, "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones*, 80 U.S. at 728.

"[T]he First Amendment 'permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.'" *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 187, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) (*Hosanna-Tabor*) (quoting *Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724, 96 S. Ct. 2372, 49 L. Ed. 2d 151 [1976]). Moreover, "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." 426 U.S. at 713.

"The jurisdiction of the courts to address matters involving church affairs is limited." *Church of God in Christ v. Board of Trustees*, 26 Kan. App. 2d 569, 572, 992 P.2d 812 (1999) (*New Jerusalem*). Where a local congregation affiliates with a denomination in conformity with the rules constituting the ecclesiastical law of that

19

church body, "'the right of dominion, control and disposal of church property . . . is governed by church law.'" *In re Testamentary Trust of Keys*, 40 Kan. App. 2d 503, 515, 193 P.3d 490 (2008) (quoting *United Brethren, Etc. v. Mount Carmel Community Cemetery Ass'n*, 152 Kan. 243, Syl. ¶ 1, 103 P.2d 877 [1940]). Thus, in cases involving disputes over the ownership or control of church property, civil courts will take jurisdiction only "'to assure the regularity of business practices and the right of private use and ownership of property.'" *Keys*, 40 Kan. App. 2d at 515-16 (quoting *New Jerusalem*, 26 Kan. App. 2d 569, Syl. ¶ 2).

### a. Principle of Hierarchical Deference

Here, the district court applied the principle of hierarchical deference in ultimately ruling in favor of the faction of members who desired for the PCOS to maintain its affiliation with the PCUSA. The United States Supreme Court established this legal principle in *Watson v. Jones*, 80 U.S. at 727. Specifically, the Supreme Court held:

> "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." 80 U.S. at 728-29.

In *Watson*, the United States Supreme Court also distinguished between two types of church property disputes—those involving "a strictly congregational or independent" church organization and those involving a congregation that is part of a "hierarchical" denomination or church body. 80 U.S. at 724-26. In cases involving a schism in an independent or nondenominational congregation, the Supreme Court held that "the rights

20

of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations." 80 U.S. at 725. In cases involving a schism within a congregation affiliated with a hierarchical denomination, however, the Supreme Court held that civil courts "are bound to look at the fact that the local congregation is itself but a member of a much larger . . . religious organization, and is under its government and control, and is bound by its orders and judgments." 80 U.S. at 726-27.

It is important to recognize that rarely—if ever—do disputes over the ownership or control of church property arise in a secular vacuum. As in the present case, disputes between factions over who has the right to control a local congregation's property frequently arise out of an underlying disagreement regarding issues relating to theological or internal church polity. See *Watson*, 80 U.S. 679 (church property dispute arose out of theological dispute over the issue of slavery); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (church property dispute arose over conflicting claims between archbishops over use of cathedral); *Serbian Orthodox Diocese*, 426 U.S. at 724-25 (church property dispute arose out of the removal of a bishop). Thus, where church property disputes have been presented to and decided by church tribunals of a hierarchical denomination, the United States Supreme Court has found it to be appropriate for civil courts to "accept such decisions as final, and as binding on them, in their application to the case before them." 80 U.S. at 727.

We note that the United States Supreme Court decided *Watson* before the First Amendment was applied to the States through the Fourteenth Amendment. Likewise, it was decided prior to *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), in which the Supreme Court found that there was no federal common law and that federal courts must apply the law of the state. Nevertheless, we note that the Supreme Court has since indicated on numerous occasions that the principle of hierarchical deference announced in *Watson* is rooted in the First Amendment Religion Clauses and is applicable to the States through the Fourteenth Amendment. See *Serbian Orthodox*

21

*Diocese*, 426 U.S. at 710-11; *Presbyterian Church v. Hull Church*, 393 U.S. 440, 447-48, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *Kedroff*, 344 U.S. at 116. Likewise, we note that Kansas courts have recognized the principle of law set forth in *Watson* for many years. See *United Brethren, etc., v. Mount Carmel Community Cemetery Ass'n*, 152 Kan. 243, 247, 103 P.2d 877 (1940)(quoting *Watson*, 80 U.S. at 680, when stating: "'In such cases where the right of [church] property . . . is dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it.").

More than 135 years ago, the Kansas Supreme Court found that "[a] person who voluntarily joins a church, and tacitly at least agrees to be bound by all rules and regulations of such church, cannot afterwards be allowed to wholly ignore and disregard such rules and regulations." *Venable v. Baptist Church*, 25 Kan. 177, 182 (1881). Moreover, in *Jackson v. Jones*, 130 Kan. 488, 491, 287 P. 603 (1930), our Supreme Court held that

> "'[t]he separation or secession of part of the members from a church does not . . . lessen the rights of those adhering to the organization . . . and the courts, when called upon, will award the property . . . to those who continue to adhere to the doctrine, tenets, and rules of the church as they existed before the division.'"

Similarly, in *Hughes v. Grossman*, 166 Kan. 325, Syl. ¶ 3, 201 P.2d 670 (1949), our Supreme Court concluded that "[a]s a general rule a schism in a church does not destroy the church's identity nor lessen the rights of individual members adhering to its original doctrine, tenets and rules before the division." See also *Simpson*, 188 Kan. at 141 ("When it can be decided by church law or ecclesiastical hierarchy which group represents the true doctrine of the church, that group will receive the whole of the church property."); *Whipple v. Fehsenfeld*, 173 Kan. 427, 432, 249 P.2d 638 (1952) (quoting *Hughes*, 166 Kan. 325, Syl. ¶ 4, stating: "'When a schism occurs in a church the . . .

22

question is which of the rival factions adheres to the . . . original tenets, beliefs, rules and practices of the organization and . . . the civil courts when called upon will award the church property to those who continue to adhere thereto.'"); accord *Church of God in Christ, Inc. v. Stone*, 452 F. Supp. 612, 616 (D. Kan. 1976).

More recently, the Kansas Supreme Court explained the principle of hierarchical deference in *Kennedy v. Gray*, 248 Kan. 486, 807 P.2d 670 (1991), as follows:

> "The First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept tribunal decisions as binding upon the courts." 248 Kan. 486, at Syl. ¶ 3.

Although *Kennedy* did not involve a dispute over church property, our Supreme Court analyzed the different rules that apply when a congregation is affiliated with a hierarchical church "with a governing body, set rules of procedure, and an internal appeals procedure" as opposed to a congregational or nondenominational church "in which the congregation makes all decisions by a majority vote." 248 Kan. at 493. In a hierarchical church, our Supreme Court found that deference should be given to the highest church body to which an issue has been presented. 248 Kan. at 493 (citing *Serbian Orthodox Diocese*, 426 U.S. at 708-09). On the other hand, in a congregational or nondenominational church, our Supreme Court found that secular principles of law that are "applicable to public and private lay organizations and to civil governments as well" should be applied. 248 Kan. at 494.

Similarly, in *New Jerusalem*, 26 Kan. App. 2d at 573, our court found that "[w]hen a local religious organization has acquired property through the contributions and sacrifices of many members, past and present, all of who have adhered to certain

23

doctrines . . . [of] a particular national denomination, no faction may be permitted to divert the church property to another denomination . . . ." Moreover, we have held that "[n]either state nor federal courts may undertake the resolution of quintessentially religious controversies, whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of the Church." *Church of God in Christ, Inc. v. Board of Trustees*, 47 Kan. App. 2d 674, Syl. ¶ 4, 280 P.3d 795 (2012). Thus, we find that where a dispute over the control of church property arises out of a schism within a congregation that is affiliated with a hierarchical denomination and a decision regarding the issue has been made by the highest tribunal of that denomination to which the issue has been presented, civil courts are to accept the decision of the tribunal as binding.

Furthermore, we find that civil courts can apply the principle of hierarchical deference in such cases by answering the following straightforward questions from a purely *secular* perspective:

- First, was the congregation affiliated with a hierarchical church body or denomination prior to the schism?

- Second, does the hierarchical church body or denomination have its own rules and procedures for the resolution of property disputes arising out of a schism?

- Third, has there been a determination of the property dispute by the highest tribunal of the hierarchical church body or denomination to which the issue has been presented?

If the answers to each of these questions is in the affirmative, then a civil court must accept the decision of the church tribunal as binding.

24

In the present case, it is undisputed that the PCOS has a longstanding affiliation with the PCUSA, which is a hierarchical church body. It is also undisputed that the PCUSA has its own internal rules and procedures regarding how a local congregation can terminate or sever its affiliation with the denomination. See *Book of Order*, Section G-4.0207. These internal rules and procedures also discuss how to determine which faction of members should be entitled to the congregation's property in the event of a schism. See *Book of Order* Section G-4.0207. Likewise, it is undisputed that on September 10, 2014, the Administrative Commission of the Heartland Presbytery determined that there was a schism within the membership of the PCOS and declared that those members of the congregation who desire to continue the PCOS's affiliation with the PCUSA are entitled to the congregation's property.

Furthermore, the Permanent Judicial Commission of the Heartland Presbytery affirmed the decision of the Administrative Commission following a hearing held on November 13, 2014. As indicated above, the Permanent Judicial Commission expressly concluded:

- "The action of the Session to call a congregational meeting for October 5, 2014, for the purpose of 'disaffiliation' is found to have been irregular, and that any actions taken at that meeting or any other such improperly called meeting of the congregation are held to have no binding effect."

- "The Session be enjoined from calling any further congregational meeting for the purpose of 'disaffiliating' from [PCUSA] or affiliating with another Reformed body, or changing corporate documents to diminish the relationship of the corporation or the congregation with [PCUSA]."

- "The Session be enjoined from spending congregational funds for advancement of unconstitutional purposes; from selling, encumbering, or leasing real property without expressed approval of the Presbytery (G-4. 026); and from permitting or directing Trustees to perform these activities."

- "The Session comply with duly issued directives of the Administrative Commission."

We, therefore, conclude that the district court properly applied the principle of hierarchical deference in this case. In particular, we conclude that the district court appropriately deferred to the decision of Heartland Presbytery regarding which faction of members within the PCOS should be entitled to the congregation's property as a result of the unfortunate schism that has developed.

## b. Neutral-Principles Approach

The appellants contend that Kansas should abandon the principle of hierarchical deference and replace it with some form of the neutral-principles approach as allowed in *Jones v. Wolf*, 443 U.S. 595, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979). In *Jones v. Wolf*, which was a 5-4 decision of the United States Supreme Court, the majority held that using a neutral-principles approach in resolving church property disputes does not violate the First Amendment. 443 U.S. at 603-04. It is important to recognize, however, that the majority did not overrule *Watson v. Jones*, 80 U.S. 679, nor did it mandate the use of the neutral-principles approach by state courts in church property disputes. Instead, the majority in *Jones v. Wolf* expressly found that "'a State may adopt any one of various approaches for settling church property disputes'" so long as it does not violate the First Amendment. 443 U.S. at 602; see also *Heartland Presbytery v. Gashland Presbyterian Church*, 364 S.W.3d 575, 589-90 (Mo. App. 2012) ("[T]he First Amendment does not dictate that a State must follow a particular method of resolving church property disputes.").

In approving the neutral-principles approach as an option to be used in resolving church property disputes, the majority in *Jones v. Wolf* acknowledged that civil courts may still be required "to examine certain religious documents" in attempting to determine

26

the intent of the parties. 443 U.S. at 604. Furthermore, the majority recognized that when religious concepts are incorporated into documents such as a deed, a corporate charter, or the constitution of the general church, courts must "defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." 443 U.S. at 604 (citing *Serbian Orthodox Diocese*, 426 U.S. at 709). Unfortunately, although the majority approved the neutral-principles approach in theory, it gave little guidance on how it should actually be applied and, instead, remanded the case to the Georgia Supreme Court for application. 443 U.S. at 606-08.

Writing for the four dissenting justices in *Jones v. Wolf*, Justice Lewis F. Powell, Jr., cautioned that if a state court disregards a decision of the highest tribunal within a hierarchical church body regarding which faction is entitled to control a congregation's property following a schism, it "effectively will have reversed the decisions of doctrine and practice made in accordance with church law." 443 U.S. at 613. According to the dissent, "[t]his indirect interference by the civil courts with the resolution of religious disputes within the church is no less proscribed by the First Amendment than is the direct decision of questions of doctrine and practice." 443 U.S. at 613. Finally, the dissent cautioned that those who "depart from *Watson v. Jones* . . . will travel a course left totally uncharted by this Court." 443 U.S. at 616.

We note that as recently as 2012, a unanimous United States Supreme Court cited *Watson v. Jones* favorably in its *Hosanna-Tabor* opinion. 565 U.S. at 185-86. In *Hosanna-Tabor*, the Supreme Court held that an employment disability law could not be enforced against a hierarchical church body for terminating a minister. 565 U.S. at 196. In reaching this conclusion, the Supreme Court looked to *Watson* and its progeny for guidance, finding that these decisions involving disputes over church property "confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers." 565 U.S. at 185-87 (citing *Watson*, 80 U.S. 679; *Kedroff*, 344 U.S. 94; and *Serbian Orthodox Diocese*, 426 U.S. 696).

27

Significantly, the *Hosanna-Tabor* court reiterated that *Watson* "'radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" 565 U.S. at 186 (quoting *Kedroff*, 344 U.S. at 116). Interestingly, the Supreme Court did not mention the *Jones v. Wolf* opinion in *Hosanna-Tabor*. Although we will not speculate as to the reason for this omission, it seems clear that the United States Supreme Court has not abandoned the principle of hierarchical deference as a constitutionally sound way for state courts to resolve disputes arising within a hierarchical denomination.

Of course, both the district court and this court are "duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position." See *Hoesli v. Triplett*, *Inc*., 303 Kan. 358, 360, 361 P.3d 504 (2015); *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128 (2015). In the more than 37 years since *Jones* was decided, we cannot find any appellate cases in which a neutral-principles approach has been applied in resolving a dispute over church property rights arising out of a schism within a congregation affiliated with a hierarchical denomination. Moreover, we do not find any indication that our Supreme Court desires to repudiate the principle of hierarchical deference that has served the citizens of Kansas well for many years.

Although the appellants rely on *Gospel Tabernacle Body of Christ Church v. Peace Publishers & Co.*, 211 Kan. 420, 506 P.2d 1135 (1973), there is nothing in the decision that would indicate that Gospel Tabernacle was affiliated with a hierarchical denomination. Rather, the congregation is described as an unincorporated organization. 211 Kan. at 421. Furthermore, the case did not involve a dispute between factions within the church over property but involved the issue of whether the congregation's former minister had the right to transfer church property without authorization from the members of the congregation. 211 Kan. at 422.

The appellants also cite *Purdum v. Purdum*, 48 Kan. App. 2d 938, 301 P.3d 718 (2013), in support of their argument. In *Purdum*, the majority held that the First Amendment precludes a civil court from exercising jurisdiction over the subject matter of a defamation action arising out of statements allegedly made during an ecclesiastical annulment proceeding in the Roman Catholic Church. As such, *Purdum* did not involve a dispute over church property. Although the majority in *Purdum* cited *Jones v. Wolf*, 443 U.S. at 595, for the premise that excessive entanglement between church and state violates the Establishment Clause of the First Amendment, it also cited *Watson v. Jones*, 80 U.S. at 679, for the proposition that the First Amendment gives churches the freedom to govern themselves without interference from civil courts. 48 Kan. App. 2d at 948, 951.

In addition, as noted by the district court in its memorandum decision, the Kansas House of Representatives defeated H. Substitute for S.B. No. 18 (2013 Session). This bill would have required Kansas courts to apply the neutral-principles approach to church property disputes, including those arising out of a decision by a majority of members to have a congregation to terminate its affiliation with a hierarchical denomination. Although the bill was reintroduced in the 2015 legislative session as H.B. No. 2161, this legislation died in the House Judiciary Committee. Thus, it appears that the Kansas Legislature is satisfied with Kansas courts continuing to apply the principle of hierarchical deference to resolve church property disputes arising out of a schism in a congregation affiliated with a hierarchical church body or denomination.

### c. *Strict v. Hybrid Neutral-Principles Approaches*

We recognize that after *Jones* was decided in 1979, a majority of states chose to adopt some form of a neutral-principles approach in resolving church property disputes while a minority of states continue to follow the hierarchical deference approach. See *Hope Presbyterian Church of Rogue River v. Presbyterian Church (U.S.A.)*, 352 Or. 668, 684 & n.3, 291 P.3d 711 (2012). Of those states that have adopted a neutral-principles

29

approach, we note that some apply a "strict" neutral-principles approach in which only secular documents are reviewed. Others, however, follow a "hybrid" neutral-principles approach in which church documents are reviewed in addition to secular legal documents. See *Episcopal Church in Diocese of Connecticut v. Gauss*, 302 Conn. 408, 425 n.11, 28 A.3d 302 (2011).

If Kansas were to adopt a neutral-principles approach, we believe that a "hybrid" approach would be more consistent with the requirements of the Religion Clauses of the First Amendment as well as Section 7 of the Kansas Constitution Bill of Rights. Moreover, we believe that reviewing all of the relevant documents—including church documents—from a secular perspective is the best way for a civil court to determine the intent of the parties. As indicated above, the majority in *Jones* acknowledged that even under a neutral-principles approach, civil courts may still be required to examine certain religious documents—such as a church constitution—in a secular manner in attempting to determine the intent of the parties prior to a schism. 443 U.S. at 604.

We find the Georgia Supreme Court's opinion in *Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church, Inc.*, 290 Ga. 272, 719 S.E.2d 446 (2011), to be helpful in our review of the present case. The *Timberridge* opinion is particularly significant because it was the Georgia Supreme Court that adopted the neutral-principles approach in *Jones* that was reviewed by the United States Supreme Court. *Jones*, 433 U.S. at 600. Moreover, we find the *Timberridge* opinion to be significant to the present case because it also involves a dispute over the control of church property of a local congregation seeking to end its longstanding relationship with the PCUSA. 290 Ga. at 272.

In *Timberridge*, the Georgia Supreme Court applied a hybrid neutral-principles approach—reviewing the deeds, local church documents, and national church documents from a secular perspective to determine the intent of the parties. 290 Ga. at 276-77. The

court found "the absence of language in the deeds creating a trust in favor of the national church [to be] of limited value" and turned to a review of other relevant documents. 290 Ga. at 277. In doing so, the court noted that the majority in *Jones* had specifically suggested that "'the constitution of the general church can be made to recite an express trust in favor of the denominational church'" and that "'[t]he burden involved in taking such steps will be minimal.'" 290 Ga. at 280 (quoting *Jones*, 443 U.S. at 606).

The Georgia Supreme Court recognized that a trust relationship may be established by deeds or other secular legal documents. However, it found that such a relationship "may also be [established] through the national church's constitution, for example, by making it 'recite an express trust.'" 290 Ga. at 280-81 (quoting *Jones*, 443 U.S. at 606). To hold otherwise, the court reasoned, would place an "immense" burden on both hierarchical denominations and local congregations. 290 Ga. at 281.

The *Timberridge* court noted that the congregation—just like the PCOS—had "joined the PCUSA when the reunited church was established in 1983." 290 Ga. at 284. At that time, "the PCUSA's governing constitution plainly stated that local churches hold their property in trust for the use and benefit of the general church." 290 Ga. at 284. Accordingly, the Georgia Supreme Court found that by "affiliating with the PCUSA in 1983 with the trust provision *already* in the [PCUSA's] governing constitution demonstrated that Timberridge assented to that relinquishment of its property rights" and that the congregation's "continued membership in the PCUSA, for nearly a quarter of a century in all, with the trust provision always in full effect, further bolsters this conclusion." 290 Ga. at 284-85.

The Georgia Supreme Court noted in *Timberridge* that unlike *Jones* in which the church documents did not mention property issues, the PCUSA's documents specifically included trust language as well as the procedure for resolving church property disputes arising out of a schism. 290 Ga. at 287 (citing *Jones v. Wolf*, 244 Ga. 388, 389-90, 260

31

S.E.2d 84 [1979]). The court found that its decision did not merely rest on the relationship between the PCUSA and the local congregation but also "derives from the specific language of the governing documents adopted by the local and general churches . . . ." 290 Ga. at 287-88. Thus, in determining that the local congregation held the property in trust for the PCUSA, the Georgia Supreme Court concluded that "[a]pplying the neutral principles with an even hand, we simply enforce the intent of the parties as reflected in their own governing documents; to do anything else would raise serious First Amendment concerns." 290 Ga. at 287.

In the present case, the PCOS also affiliated with the PCUSA in 1983 and continued to maintain this affiliation for more than 30 years before the schism occurred. As noted by the Georgia Supreme Court, the language of the *Book of Order* already provided by 1983 that the property of the PCUSA—including the property of its local congregations—"is held in trust . . . for the use and benefit of the [PCUSA]." Moreover, at the time the PCOS affiliated with the PCUSA, the *Book of Order* already contained a provision providing that in the event of "a schism within the membership of a congregation . . . the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the [PCUSA]." Thus, we conclude that this language set forth in the *Book of Order*—as viewed from a secular perspective—should control regardless of whether the principle of hierarchical deference or the neutral-principles approach is applied.

*Express or Implied Trust Relationship*

Heartland Presbytery contends on cross-appeal that the district court erred in finding that the PCOS did not hold the church property in trust for the PCUSA. In addition to citing to the language of the *Book of Order*, it also argues that under existing Kansas case law "[a] continual, longstanding, and formal affiliation with a national church is sufficient to support an implied trust in favor of the national church." *Church of*

32

*God in Christ, Inc.*, 47 Kan. App. 2d 674, Syl. ¶ 13; see *New Jerusalem*, 26 Kan. App. 2d at 580. Nevertheless, in light of our decision to affirm the district court's decision on the grounds that it appropriately deferred to the determination by the highest tribunal of the Heartland Presbytery to which the issue was presented, it is unnecessary for us to reach this issue.

CONCLUSION

In 1983, the PCOS voluntarily joined the PCUSA, which is a hierarchical organization. By doing so, the PCOS consented to be bound by the Constitution of the PCUSA. The *Book of Order*—which is an integral part of the PCUSA's constitution—expressly provides a procedure for the internal resolution of church property disputes arising out of a schism within the membership of one of the PCUSA's congregations. Here, it is undisputed that the highest ecclesiastical tribunal to which the issue was presented determined that the members of the staying faction who desire for the PCOS to continue its longstanding affiliation with the PCUSA are entitled to the disputed property. Accordingly, although we respect the right of the members of the leaving faction to freely exercise their religious beliefs, we conclude that it was appropriate for the district court to defer to the tribunal's decision regarding the church property.

Affirmed.